ALFRED D. CHANDLER,

*vs.*

BELLANCA AIRCRAFT CORPORATION, a corporation of the State of Delaware, AND FRANK BELLANCA, JOHN G. ROLPH, UGO V. D'ANNUNZIO AND HARRY HEWETT, also known as HARRY HERWITZ.

*New Castle, Aug. 5, 1932.*

*Clarence A. Southerland,* of the firm of Ward & Gray, for complainant.

*James R. Morford* and *Christopher L. Ward, Jr.,* of the firm of Marvel, Morford, Ward & Logan, for defendants.

THE CHANCELLOR: The principal question which this case presents is whether or not the 168,165 shares standing in the name of the voting trustees which G. M. Bellanca

for himself as trustee and as proxy for Kahn, trustee, and Andrew Bellanca as trustee undertook to vote, were properly voted. This in turn depends on the sufficiency in law of Kahn's proxy to Bellanca.

Before considering the main question, it is perhaps best to clear away three contentions made by the defendants, any one of which, if good, would render unnecessary the consideration of the main question.

First. Does the fact that the complainant is the holder of a voting trust certificate disqualify him as a party who is entitled to call for a review of the election? This question is raised because *Section* 31 of the *Act* (*Revised Code* 1915, § 1945, as amended by 35 *Del. Laws, c.* 85, § 15) under which the proceedings were instituted specifies that a review of an election can be had on "application by any stockholder." It is contended that because the complainant transferred his stock to voting trustees, receiving from them only a voting trust certificate, he does not qualify as a "stockholder" of the corporation.

In *Cooney Co. v. Arlington Hotel Co.*, 11 *Del. Ch.* 286, 101 *A.* 879, this court held that the holder of a voting trust certificate who had transferred his shares to voting trustees is liable for the statutory assessment for the benefit of creditors to the extent of the amount not paid in on the shares represented by the voting trust certificate, notwithstanding the statute fixed the liability on the "stockholders." In New Jersey the Court of Errors and Appeals in *U. S., etc., Co. v. O'Grady*, 75 *N. J. Eq.* 301, 71 *A.* 1040, 21 *L. R. A.* (*N. S.*) 732, held that the holder of a voting trust certificate who had transferred his shares to trustees under a voting trust agreement was a stockholder within the meaning of the statute which permitted the filing of a bill for a receiver by "stockholders" of an insolvent corporation. The principle of these cases supports the right of the complainant to resort to the remedy made available by *Section* 31 of the act to stockholders of the corporation. Consider-

ing the equities of the situation of a holder of voting trust certificates, it would be an unjustifiably invidious distinction that would remove him from the category of "stockholder" to which the principle of the foregoing cases would assign him, when all that he seeks to do is to ascertain whether or not one of the important purposes of the trust to which he is a party, the one in fact which it was the principal object of himself and his co-depositors to achieve, had been faithfully served.

Second. It is next contended that the complainant was elected a director at the meeting whose result he now assails, accepted and acted in the office, and has been chosen by the board so elected and has acted as treasurer of the corporation, and that by reason of these facts he is estopped from now complaining that the election of directors was an invalid one. To this it is sufficient, without more, to say that the complainant was not at the meeting and is not shown to have been aware of the circumstances which transpired at the meeting. Since he became advised of the facts, he has consistently protested against the legal propriety of the proceedings.

Third. It is contended that if the vote of the 168,165 shares be rejected as the complainant desires, yet G. M. Bellanca voted 300 shares which belonged to him individually and that they being lawful votes and all that were cast (ignoring the 168,165), the Bellanca ticket thus appears to have been elected. This contention invites consideration of the question of whether a majority of the votes cast at a stockholders' meeting will carry an election, if such majority is in fact a minority of those present though not all voting. I find it unnecessary however to consider that question because on the present showing I am not prepared to say whether or not G. M. Bellanca is entitled in this proceeding to be regarded as a voting stockholder in right of the 300 shares. I leave that as an open question.

Last and finally then, I approach the main question—

was the proxy from Kahn, voting trustee, to Bellanca, another voting trustee, one that Bellanca was at liberty to exercise?

Voting trusts enjoy statutory recognition in this State. *Section* 18 of the *General Corporation Law,* as amended (*Revised Code* 1915, § 1932, as amended by 37 *Del. Laws, c.* 129, § 6), in its second paragraph, provides as follows:

"One or more stockholders may by agreement in writing deposit capital stock with or transfer capital stock to any person or persons or corporations authorized by their charter to act as Trustee, for the purpose of vesting in said person, persóns or corporations the right to vote thereon for any period of time determined by such agreement, not exceeding ten years, upon terms and conditions stated in such agreement pursuant to which such person, persons or corporations shall act. Such agreement may contain any other lawful provisions not inconsistent with said purpose. After filing a copy of such agreement in the principal office of the corporation in the State of Delaware, which copy shall be open to the inspection of any stockholder of the corporation or any depositor under said agreement daily during business hours, the certificates of stock so transferred shall be surrendered and canceled, and new certificates therefor shall be issued to such transferee or transferees, who may be designated Voting Trustees, in which said new certificates it shall appear that they are issued pursuant to such agreement, and in the entry of such transferee or transferees as owners of such stock in the proper books of the issuing corporation that fact shall also be noted, and thereupon said transferee or transferees may vote upon the stock so transferred during the period in such agreement specified; stock standing in the name of such Voting Trustees may be voted either in person or by proxy, and in voting said stock, such Voting Trustees shall incur no responsibility as stockholder, Trustee, or otherwise, except for their own individual malfeasance. In any case where two or more persons are designated as Voting Trustees, and the right and method of voting any stock standing in their names at any meeting of the corporation are not fixed by the agreement appointing said Trustees, the right to vote said stock and the manner of voting the same at any such meeting shall be determined by a majority of said Trustees, or if they be equally divided as to the right and manner of voting the same in any particular case, the vote of said stock in such case shall be divided equally among the Trustees."

The statute was enacted in 1925 (34 *Del. Laws, c.* 112, § 6), and the voting trust here involved was therefore created under statutory warrant. The question of the legality of so-called voting trusts as being in contravention of public policy, a question which has given rise to a contrariety of judicial opinion in various of the states where no statute authorizing them exists, cannot therefore arise in the instant case.

The complainant's argument emphasizes the essential trust feature of the voting trust. He rests his case at the outset on the proposition inherent in all trusts, whatever their nature, that the trustee in whom the trust duties are reposed is under a solemn responsibility himself to perform those duties and cannot entrust their performance to another. The maxim *delegatus non potest delegare* is applicable with special force to the office of a trustee. And so here it is argued that when Kahn undertook to assign to Bellanca the duty of deciding for him who should be elected directors of this corporation, he abandoned to another that function of judgment and decision in a matter which, in a very particular and special sense, was entrusted by the very terms of the agreement itself to the arbitrament of his own "best judgment."

It may be accepted as true that a voting trust is a trust in the accepted equitable sense and is subject to the principles which regulate the administration of trusts. But when a question is raised of whether a trustee has strayed from the principles which equity regards as over-lying his duties, it is apparent that the first inquiry is—what are his duties? And in answer to that inquiry we must turn to the instrument which creates the office. We must examine it particularly to ascertain the duties, to see what powers are granted and how, if at all, it defines the manner of their exercise. Certainly if there be no offense against statute or public policy, parties to trust agreements are at liberty to adopt any provisions as to either substance or mechanics which they may choose to adopt.

We are here concerned with the granting by a trustee of a proxy to another to cast for him his vote in a discretionary matter. Generally speaking a discretionary trust cannot be delegated. But if the terms of the trust permits the delegation, I do not see why a court should deny it, especially where, as in such arrangements as the modern voting trusts embody, if the parties are not allowed to agree that one trustee may constitute another as his proxy, the convenience of the trust's administration, where there are several trustees, may on occasions be interfered with. The statute in authorizing the creating of voting trusts expressly empowers the parties thereto to state the terms and conditions of it in the agreement.

The only provision in the statute respecting proxies is that "stock standing in the name of such Voting Trustees may be voted either in person or by proxy." The argument of the solicitor for the complainant, correctly I think, would allow to this provision of the statute no greater effect than simply this, that after the trustees had reached a decision concerning how they should vote the stock, they might by virtue of the statutory authority, if they choose, select an agent or proxy to perform the ministerial act of voting it.

As the pending controversy has shaped itself under the facts, the question here does not have to do with the use of a proxy in such a purely formal act of voting as was just referred to. It has to do rather with whether one trustee can appoint by proxy another one to act for him in the matter of reaching the decision by the trustees or a majority of them which must precede the formal casting of the vote. As to such a matter as that which involves judgment and discretion, the complainant contends that no trustee can divest himself of his personal duty and shift it to the shoulders of another. Furthermore, it is contended, that the scheme of the trust contemplates that the trustees should gather in a meeting for the purpose of exchanging

views and, after having taken common counsel together, reach a result which shall be expressive of their collective judgment. Nothing short of this, it is contended, will satisfy the obligations of the trust which the five trustees have undertaken to perform.

The early case of *Attorney General v. Scott,* reported in 1 *Ves. Sr.* 413, 27 *Eng. Rep.* 113, decided by Lord Hardwicke in 1749, is cited in support of these views. In that case, by a decree entered by Lord Chancellor Bacon, twenty-five of the principal inhabitants of the parish of Leeds were to present and elect a proper person as minister for the parish. An incumbent died and the electing body was reduced by the death of one of its members to twenty-four. These were evenly divided between two candidates, Scott and Kirkshaw. Later one of the twenty-four died, and another election was thereupon attempted. Seven of the supporters of Scott were present in person and five gave proxies, and the question was whether the absent trustees could vote by proxy. Lord Hardwicke held that they could not, expressing himself upon the point we are here interested in as follows:

"The law presumes persons who meet to elect to act reasonably; and that the reasons and arguments offered by one would influence the others: therefore the not giving an opportunity to one to meet, avoids the election, as had been frequently determined. Other candidates might be proposed; which ought to have been taken into consideration; and the majority of the whole number might have agreed therein; for I am not to presume they all intended to adhere to their former opinion.

\* \* \* \* \*

. "Another objection, which deserves consideration, as I may be obliged to give some directions about it, is as to the proxies: first that by law no proxy ought to be admitted to vote. Next, that if they ought, there was not a sufficient number to give Scott a majority, by making up the number twelve; for that one of the proxies' vote was void, as the person who gave him a letter of attorney appeared himself. There is no evidence that proxies were admitted before in this election: but the trustees agreed among themselves to vote by

proxy; and if it rested on that and they had met regularly, they might, I doubt not, have made proxies to sign the presentation; for it is true that a trustee who has a legal estate vested in him, may make an attorney to do legal acts: and I should have been unwilling to void the election upon that head, if it had been in pursuance of that agreement; but it was not so. Here is a personal trust; the decree has directed the election should be by the trustees or the major part: if then the trust must be executed by the major part, which requires judgment, there is no instance where a trustee is allowed to make a proxy to vote in a personal trust of this kind; the trustees were themselves to judge of the qualifications of the candidates, and could not delegate that judgment to others, but ought to exercise it themselves. Then as to the next, I doubt whether that proxy did subsist to give a vote, and should have thought it was determined by the party's meeting, but it is not necessary to give an opinion about that. I think these proxies, so far from being the better for the name of the particular person, for whom they are to vote being given, they are the worse for it; the trustee, who does so, determining himself without hearing his brother trustees. On these reasons the election of Scott is not to be supported: consequently that bill must be dismissed absolutely."

The foregoing quotation expresses the main principle upon which the argument of the complainant proceeds in support of his case in the cause *sub judice*. It is the same principle which inheres in the rule that directors of a corporation may not act as such except in meeting assembled where the advantages of collective deliberation are to be had.

The difficulty I have however in applying that principle to this case is that the terms and conditions of the agreement which the statute authorizes the parties to it to prescribe, are so framed as to make the principle inapplicable. The principle embraces two things. One is the assembling for discussion and the exchange of views; the other is, the exercise of discretion by each trustee in reaching a decision. Now as to the first, it is perfectly plain that the agreement in its tenth paragraph obviates the necessity of it. As to the second, certainly it is plain also that any trustee is permitted by the same paragraph of the agreement

to express his judgment by a proxy. But must the judgment so expressed be the individual judgment of the trustee, with the proxy acting simply as an agent to express it; or may the judgment notwithstanding it be the individual judgment of the person holding the proxy, nevertheless be considered in law as the judgment of the trustee vicariously expressed? That is the question.

In the ordinary case of an unrestricted proxy given by a stockholder to another to represent him as attorney in fact at a stockholders' meeting it must be presumed that what the attorney does in the proper exercise of the power conferred expresses the will of the stockholder. *Hexter v. Columbia Baking Co.*, 16 *Del. Ch.* 263, 145 *A.* 115. The same rule applies where a majority of five named attorneys is given power to decide how the vote shall be cast. *Id.*

The defendants contend that the same rule is applicable here in the matter of an unrestricted proxy given by one of the five trustees, viz., that what the holder of the proxy does in the proper exercise of the power must be presumed to be expressive of the will of the trustee. The complainant on the other hand contends that inasmuch as a trust relation is interposed by the voting trust agreement between the stockholder and the trustee, the principles ordinarily applicable to a proxy and its exercise are not to be applied and that in such a case the proxy can do nothing more than express the trustee's judgment—he cannot express his own.

The complainant's argument stresses the word "trust" in the situation. Just what is the trust phase of the agreement? The agreement is not concerned with voting alone. It is concerned with much more, for under it the trustees have title to all the deposited stock. It takes pains to define the equitable ownership of the stock as being in the depositors. Detailed provisions are made to secure the ultimate transfer of the legal title to the equitable owners, and in the meantime to give to them all dividends and assure to

them all sorts of rights accruing to the stockholders except that of voting. Those, I conceive, are the features which primarily are indicated by the word "trust." As to the voting rights, is there anything more to the agreement than this—that the stockholders have in substance constituted the trustees their irrevocable proxies for the period limited by the agreement to vote the stock? If so, are the trustees, with respect to voting rights, any differently situated from the familiar attorney-in-fact holding a stockholder's proxy? I do not see that the word "trust" can have any bearing on the trustee's duties with respect to voting, under this particular agreement, which in any sense differentiates a proxy given by one of them to another from the usual proxy given by a stockholder to another with power of substitution. When the usual proxy contains a substitution clause, no one has ever, so far as I know, questioned the right of a substitute to act in place of the delegated attorney named by the principal. It seems to me that the agreement in paragraph ten does no more than provide for a power of substitution by any one of the trustees of another person to act in his stead. To say that the depositing stockholders could not as a matter of law agree to such a power of substitution would appear to be as indefensible as it would be to say that in the everyday occurrence of proxies from stockholders with power of substitution no one but the original delegate can act.

If it be suggested that the first sentence of paragraph ten of the agreement indicates that the trustees can meet only in pursuance to rules and regulations adopted by them, that no rules and regulations were ever formally adopted by these trustees, and that therefore the meeting on March 2, 1932, of three of the trustees in person and a fourth, Kahn, by proxy was no meeting, it is enough to answer first, that there is no statutory provision which makes it imperative that rules and regulations shall be adopted as a condition precedent to the exercise by the trustees of

their functions; and second, the trustees by practice had established a custom of meeting and their meeting on March 2, 1932, was in accordance with their prior practice. There is no contention to the effect that notice of the meeting was not given. It was given. All five received the notice.

The terms and conditions of the trust which, under the statute, it was in the province of the parties to the agreement to prescribe, in substance provided that while five trustees were to act for the depositing stockholders, yet in so acting any trustee might, if he saw fit, substitute some other person, either another trustee or a stranger, to act in his place and stead not only for the purpose of making a quorum, but also for the purposes of deliberation, decision and voting. The forming of the trust was a voluntary act. The definition of its terms was referred by the statute to the free choice of the parties to the agreement. If they had sufficient confidence in the individuals they named as trustees to vote their stock, it is entirely reasonable to say that the same degree of confidence would warrant them in believing that any proxy named by any one of the individuals would be a fit person to act in their behalf. It is said that the giving by Kahn of his proxy to Bellanca as a practical proposition reduced the trustees to four. So it did. Indeed by means of proxies from four trustees to one, the number might as a practical proposition be reduced to a situation where only one was acting. Even so, no statutory policy would be infringed, because the statute contemplates in the phrase "person or persons" that an individual might be selected as a sole trustee. The agreement provides that any trustee may act as proxy for another. This whole matter is a question of detail which the depositing stockholders were at liberty to settle for themselves. I am unable to see why their agreement that any one of their trustees might in their behalf select a person to act as his proxy for purposes of quorum, deliberation and decision,

should be destroyed by the court. The proxy provisions of the agreement do not relate to the formal act of voting the stock. That is provided for by the statute. The proxy provisions of the agreement have reference to the trustees *qua* such.

Unfortunately the voting trustees for this corporation found themselves in pronounced disagreement upon policies. Mr. Kahn appears to have been the balance of power between the two Bellancas on the one side and Adams and Holmes on the other. The complainant takes the view that G. M. Bellanca did some underhand campaigning to secure the support of Kahn, and that Adams and Holmes were caught unawares. I shall not review the details of evidence touching this aspect of the controversy. I think, however, that it should be said that the severity of characterization of G. M. Bellanca does not appear to me to be justified. That he sought Kahn's support is undoubted. He does not deny it. He had interviews with Kahn and explained at length the aims and purposes of his plans and policies for the corporation. At the same time, I think the Adams faction was not unaware of what was going on. Their activities have not been so elaborately examined into by the defendants as were those of Bellanca by the complainant.

In view of what has been said in the main body of this opinion, it is not necessary for me to consider at length the rather voluminous testimony that relates to Bellanca's visits and conversations with Kahn. I am convinced that Kahn knew, when he gave his proxy, that Bellanca was intending to vote it in such a way as would insure the adoption by the corporation of Bellanca's program. The avenue to that end was manifestly through the directors who were to be elected. Bellanca says he discussed with Kahn changes in the board and Kahn, whose memory I may say is not as clear as could be wished, distinctly recalls two names that were suggested by Bellanca at one time or another, the defendants Frank Bellanca and D'Annunzio. The other two

defendants, Kahn did not know. The latter two were eleventh hour selections by G. M. Bellanca due to an alteration of circumstances since his last interview with Kahn before the meeting. After the meeting, Kahn expressed himself as satisfied with the result of it. It is true that some time after the meeting when he discovered somewhat of intensity in the differences of view between Bellanca and Adams, he tried to get the two leaders together in a compromise. Failing in this he gave up.

The fact remains, however, that Kahn in giving his proxy did so in the full light of Bellanca's purpose to vote it at the approaching meeting in such way as would insure the carrying out of Bellanca's policies and that Kahn knew Bellanca was proposing, to this end, an alteration in the personnel of the directorate. I can find no fraud or overreaching. Kahn exercised his judgment upon the main result to be reached and had considerable information on which to base it. The expression of his judgment at the meeting through Bellanca, his proxy, was thus buttressed by Kahn's own personal judgment—a circumstance which, as I view it, is not necessary to the validity of the proxy's action in view of the terms of the agreement, but one which affords some satisfaction to the belief that at the time when the proxy was used it was not on the whole employed contrary to the wishes of the principal who gave it.

Decree that the meeting was validly held, that the vote thereat was validly cast in favor of the eleven persons declared to have been elected and that said persons are entitled to hold office as directors for the terms to which they were respectively elected.

NOTE.—The decree entered in accordance with the foregoing opinion was affirmed on appeal to the Supreme Court without written opinion.