## BROWN v. McLANAHAN et al.

### No. 5342.

Circuit Court of Appeals, Fourth Circuit.
April 9, 1945.

Elias Field and Horace P. Moulton, both of Boston, Mass., and J. Cookman Boyd, Jr., of Baltimore, Md. (Donald T. Field, of Boston, Mass., on the brief), for appellant.

Harry N. Baetjer and John Henry Lewin, both of Baltimore, Md., for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This appeal from an order granting a motion to dismiss, involves the equitable rights attaching to certain voting trust certificates representing shares of preferred stock of the Baltimore Transit Company (hereinafter called the Company).

The appellant, Dorothy K. Brown (hereinafter referred to as plaintiff), as the holder of voting trust certificates representing 500 shares of the preferred stock of the Company, brought a class action against the voting trustees, the directors of the Company, the Company itself, the indenture trustee for the holders of the Company's debentures, and the debenture holders as a class (herein collectively referred to as defendants), seeking to set aside as unlawful an amendment of the Company's charter which purports to vest voting rights in the debenture holders. On oral argument before this Court, it was stated that the holders of 45,000 shares of preferred stock have indicated their approval of this suit.

The securities involved in this litigation were issued under a plan of reorganization of the United Railways and Electric Company of Baltimore, and The Maryland Electric Railways Company and Subsidiary Companies, under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The plan was approved by the United States District Court for the District of Maryland. In re United Railways & Electric Co. of Baltimore's Reorganization, 11 F. Supp. 717.

That part of the reorganization plan relevant to the question before us may be briefly summarized.

The plan provided for the issuance of three types of securities. Debentures in the amount of $22,083,381 and 233,427 shares of preferred stock were issued to the holders of all first lien bonds on the basis of $500 principal amount of debentures, and five shares of preferred stock, par value $100 per share for each $1,000 principal amount of the bonds; 169,112 shares of new common stock, without par value, were issued to the old common stockholders and to unsecured creditors.

Under the plan of reorganization, voting rights were vested exclusively in the preferred and common stock. Each share of preferred entitled the holder to one vote on all corporate matters (except that the power to elect one director was exclusively vested in the common stock) and further, so long as any six months' instalment of dividends on the preferred remained in arrears, the holders of the preferred stock held the *exclusive right* to vote for the election of all but one director. Three shares of common stock entitled the holder to one vote.

The plant also provided for the establishment of a voting trust of all the preferred and common stock of the reorganized company for a period of ten years, the maximum period permitted by Maryland law. In accordance with this provision, all the stock was issued to eight voting trustees under a voting trust agreement which was to terminate on July 1, 1945. The trustees in turn issued voting trust certificates to those entitled to distribution under the plan. Under the plan, the voting rights were to revert, on termination of the trust, to the certificate holders in proportion to the number of shares represented.

No dividends have ever been paid on the preferred stock, and pursuant to the charter provision, at all times since dividends have been in arrears, the exclusive right to elect all but one director has been vested in the preferred stock.

The eight voting trustees are also a majority of the directors of the Company, elected as such by their own vote as trustees. On June 21, 1944, *without notice of any kind to the certificate holders,* the directors passed a resolution recommending, and the voting trustees as stockholders voted to adopt, an amendment to the Company's charter.

Article VII of the Voting Trust Agreement, by authority of which the trustees purportedly acted, provides in part as follows:

"(1) Until the termination of the trusts of this instrument the entire right to vote upon or with respect to all shares of Preferred and/or Common Stock deposited, or at any time held hereunder, and the right to otherwise authorize, approve or oppose on behalf of said shares of stock any corporate action of The Baltimore Transit Company shall be vested exclusively in said Trustees; without limiting the generality or scope of the foregoing provisions such

rights shall include the right to vote or act with respect to any amendment of the certificate of incorporation of the Company, the increase, reduction, classification, reclassification of its capital stock, change in the par value, preference and restrictions and qualifications of all shares, the creation of any debts or liens, any amendment to the By-Laws, the election or removal of directors, the acceptance of stock in payment of dividends as well as every other right of an absolute owner of said shares, * * *"

Briefly, the amendment effected several changes in voting rights. It eliminated the arrearage clause which had provided for exclusive voting rights in the preferred stock. It also granted voting rights to the holders of debentures, one vote for each $100 principal amount of the debentures, thus creating approximately 221,000 new votes eligible to be cast in all corporate matters. And, further, as of the date of termination of the voting trust agreement on July 1, 1945, the common stockholders would be deprived of their exclusive right to elect one director.

These facts are all substantially set forth in plaintiff's complaint. The complaint alleges, and for purposes of the motion to dismiss these allegations must be accepted as true, that the creation of 221,000 new votes in the debentures will dilute the voting power of the stock; that the amendment will deprive the voting trust certificate holders of their right to control the management of the Company, and the election of its directors after the expiration of the voting trust; that these voting trustees are holders of substantial amounts of debentures, either in their own right, or as officers of various banks.

Plaintiff contends that the action of the voting trustees in adopting the amendment was a breach of the fiduciary duty owed to the certificate holders and seeks fourfold relief that: (1) The amendment of June 21, 1944, be declared null and void; (2) the voting trustees be removed; (3) the voting trust be terminated; and (4) damages be allowed in the alternative.

The crux of the complaint is that the voting trustees, faced with the fact that the voting trust would shortly expire and that they would no longer be able to control the corporation, proceeded to amend its charter so that they would be able to hold on to the control by giving voting rights to the debentures (thereby enhancing the

value of these debentures) which were largely owned or controlled by them or by corporations in which they were interested and to take away from the preferred stock the power of control which resided in it when dividends were in arrears.

Section XI of the complaint reads:

"Upon the information and belief the plaintiff says that the purpose and intended result of said purported amendment is to effect in the Voting Trustees in their individual capacities the continued control of the business and affairs of the Company after the expiration of the Voting Trust Agreement on July 1, 1945 and that said action by said Voting Trustees was motivated by the knowledge that many of the Voting Trust Certificate holders for the preferred stock were and are dissatisfied with the management of the Company by said Voting Trustees in their capacities as such and as directors of the Company, whereas, by said purported amendment valuable voting rights would be extended to the debenture holders, very many of whom will, it is believed, vote to retain the Voting Trustees in control of the Company after the termination of the Voting Trust Agreement. Upon information and belief the plaintiff also says that a majority of the Voting Trustees are either the holders of substantial amounts of debentures or are officers or directors in various banks or trust companies which own or control large amounts of said debentures, and that the vesting of voting rights in such debentures would materially increase and enhance the value of said debentures, and will diminish the value of the Voting Trust Certificates and the preferred stock."

Plaintiff contends that such action on the part of the trustees was invalid for three reasons: (1) Because it was beyond the powers vested in the trustees to diminish the voting power, which they held in trust for the holders of preferred stock as well as for other stockholders and debenture holders, so that upon the termination of the trust they would not be able to return it to those from whom they had received it in the same condition in which it was received; (2) because it was an abuse of trust to use the voting power which the trustees held in trust for the benefit of preferred stockholders as well as of the debenture holders to the advantage of the latter and the detriment of the former; and (3) that it was an abuse of trust to use the

voting power for their own benefit and the benefit of corporations in which they were interested and to the detriment of preferred stockholders who were beneficiaries of the trust. We think the action of the trustees was invalid for all three reasons. As to the third reason, it could well be that the evidence at the trial may show the facts to be different from the facts as alleged. There seems to be no dispute as to the facts to which the first and second reasons apply.

As to the first and second reasons, we think it perfectly clear that it was not intended by the voting trust agreement to vest the trustees with power either to impair the voting power of the preferred stock which they held in trust or to use the power for the benefit of the debenture holders and to the detriment of the holders of preferred stock. It is true that the power to amend the charter for proper purposes was conferred upon them; but at the time of the creation of the voting trust it was not permissible under the law to vest voting power in the debenture holders. An amendment of the law made it legal to do this; but it could not have been intended at the time of the creation of the voting trust that the trustees should exercise the voting power in a way which the law did not then recognize and which would result in taking from the holders of stock a part of the very power which they had conferred upon the trustees to be held in trust for their benefit. It is elementary that a trustee may not exercise powers granted in a way that is detrimental to the cestuis que trustent; nor may one who is trustee for different classes favor one class at the expense of another. Such an exercise of power is in derogation of the trust and may not be upheld, even though the thing done be within the scope of powers granted to the trustees in general terms. See King v. Richardson, 4 Cir., 136 F.2d 849, 859. It is well settled that the depositaries of the power to vote stock are trustees in the equitable sense, Henry L. Doherty & Co. v. Rice, C.C., 186 F. 204, 214, and a voting trust is a trust in the accepted equitable view. H. M. Byllesby & Co. v. Doriot, Del.Ch., 12 A.2d 603; Chandler v. Bellanca Aircraft Corp., 19 Del.Ch. 57, 162 A. 63; Barbour v. Weld, 201 Mass. 513, 87 N.E. 909.

The District Court appears to give particular emphasis to a letter of February 20,

1935, which the protective committee sent to the bondholders explaining the plan of reorganization. This letter contained the following statements: "The voting control of the new company, through the issue of new securities, will be vested in the present first lien bondholders. * * * Under the plan, the voting control is vested in those having the substantial ownership and first claim on income through the voting power conferred on the preferred stock." It is pointed out that the status of the debenture holders was recognized as being of prime importance at the time of reorganization.

This conclusion reached by the District Court is, without question, sound. Nonetheless, we are faced with certain inescapable facts which may not in equity be disregarded in favor of an interpretation of exactly what intentions prevailed at the time of the execution of the voting trust agreement. It is abundantly clear that at the time of reorganization, the bondholders were the parties of primary interest. But here, as in art, a change in background may alter the picture completely.

Although the debenture holders and the preferred stockholders were the same people at the time of the reorganization, subsequent transfers of the preferred stock, separate and apart from the debentures, have created two classes of security holders with adverse interests. Voting control at the outset was thus vested in the debenture holders solely by virtue, and only to the extent, of the issuance of preferred stock to these same debenture holders. Not until 1937 did controlling Maryland law allow the granting of voting rights to debenture holders in any Maryland corporation. Md. Ann. Code, Art. 23, Section 23.

True it is that the debenture holders, by reason of their first lien claims as former bondholders, had a prior claim to income, but it is equally true that the ownership of the corporation, and the attendant right to control the management came entirely from their ownership of stock, the legal title and voting rights of which, for ten years, were to rest in the hands of the voting trustees.

Defendants strongly urge that the real beneficiaries here and now are the debenture holders and not the certificate holders. Such cases as Mackin v. Nicollet Hotel, 8 Cir., 25 F.2d 783, and Clark v. Foster, 98 Wash. 241, 167 P. 908, are cited for the proposition that it is the existence of a voting trust, in many cases restricting the powers of the stockholder, that attracts lending by bondholders. Assuming the correctness of this contention, we still find no such situation here. This plan of reorganization was an attempt to salvage utility companies sinking in the quagmire of bankruptcy. These debenture holders accepted, in lieu of their old obligations, two kinds of property, ownership of the company and a creditor's lien. Ownership control, for purposes of judicious management, was placed in the hands of trustees. When the debenture holders sold their ultimate rights to stock ownership with its attendant control of the Company's affairs, they retained only their creditor's lien. We are not at liberty here to distort the established rules of property and to find that by some process of corporate alchemy the legal ownership of the Company has been transmuted into evidence of debt.

■ The sale of the voting trust certificates by the original holders vested all equitable rights in their transferees and we cannot say that one might sell the equitable rights in preferred stock to a bona fide purchaser, and subsequently by indirection, impair or destroy the inherent equitable property in those certificates, to the benefit of the original seller. Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 62 A.L.R. 1.

In this connection, it is strenuously contended by the defendants, a contention with which the District Court agreed, that the amendment in question was clearly within the purview of the voting trust agreement and the applicable Maryland law. As pointed out above, however, the fact that the power to amend the charter was granted in general terms by the voting trust agreement does not authorize an amendment in derogation of the trust reposed in the trustees. And it is worthy of note that the voting trust agreement clearly contemplates that for action which may affect the rights of the holders of voting trust certificates the trustees, for their own protection, may consult the holders in a meeting to be called for that purpose.

Article X of the voting trust agreement provides in part as follows:

"A. The Trustees may without request therefor and shall at the request in writing of either the Company or of not less than ten per cent in interest of the holders of

Voting Trust Certificates of either class, Preferred or Common, call a meeting of all Voting Trust Certificate-holders of either or each class *for the purpose of considering any matter affecting the rights of the holders of such Voting Trust Certificates*. The Trustees shall give notice of such meeting by advertisement, stating the time and place (and with or without stating the purpose) in a newspaper of general circulation published in the City of Baltimore, Maryland." (Italics ours.)

And further:

"At any such meeting the registered holder of a Preferred Stock Voting Trust Certificate shall be entitled to one vote for each share for which his Certificate may have been issued; and the registered holder of a Common Stock Voting Trust Certificate shall be entitled to one for each three shares for which his Certificate may be issued. Said votes may be cast by the registered holder in person or by proxy. A *majority in interest of the holders of either class* of Voting Trust Certificates shall constitute a quorum of that class. The Company, or if it shall fail to do so, the Trustees, shall, in writing, appoint a Secretary of such meeting, who shall keep a record of the Certificate-holders present in person or by proxy and of the proceedings of the meeting. A certified copy of such proceedings or any part thereof, including a statement of the number of Certificates of either class represented by the owner in person or by proxy and of the vote cast for or against any resolution or action certified by such Secretary to be correct, shall, for the purpose of determining the rights of third parties and *for the protection of the Trustees* and of the Depositary, be conclusive of the facts therein stated, and, with respect to the rights and obligations of the Company, shall be prima facie evidence of such facts." (Italics ours.)

If action was contemplated which would so vitally affect the rights of stockholders as the granting of voting rights to debenture holders, prudence should have dictated that the advice of the holders of voting trust certificates be *obtained* under these provisions. While we do not hold that the action of the security holders was essential to the validity of the action of the trustees in all matters affecting the rights of stockholders, the failure to seek their approval with respect to a matter which would so vitally affect their rights, is an additional reason why we should not overlook the abuse of trust involved.

 While it is true that words of Article VII grant broad authority to alter capital stock in amount, classification and preference, this Article, when read in the light of equitable doctrines affecting trusts and in connection with Article X, cannot be considered to grant unlimited authority to the trustees. Certainly it should not be construed as a grant of authority to diminish so greatly the value of the stock. Application of Bacon, 287 N.Y. 1, 38 N.E.2d 105. It cannot be said that voting power lacks the quality of property meriting judicial protection. Stokes v. Continental Trust Co., 186 N.Y. 285, 78 N.E. 1090, 12 L.R.A.,N.S., 969, 9 Ann.Cas. 738. Cf. Miles v. Safe Deposit & Trust Co., 259 U. S. 247, 42 S.Ct. 483, 66 L.Ed. 923; Thom v. Baltimore Trust Co., 158 Md. 352, 148 A. 234. The voting strength attaching to shares of stock is as much a property right as any element of dominion possessed by an owner of realty. See, also, Rohrlich, Law and Practice of Corporate Control, 27-28; Frey, Shareholders' Preemptive Rights, 38 Yale L.J., 563, 564; Drinker, The Preemptive Right of Shareholders, 43 Harvard L. Rev. 586.

 In view of what we have said, it becomes necessary to consider the allegations to the effect that the trustees exercised the powers granted them under the voting trust agreement for their own benefit or for the benefit of corporations in which they were interested. Whether such allegations could be sustained would depend, of course, upon the proofs adduced at the trial, if further trial were necessary, but by virtue of the fact that we must accept the allegations of the bill as true for the purposes of a motion to dismiss, and in view of the argument strenuously made that the question of self interest cannot arise because of the express provisions of the voting trust agreement, we feel we should say that the grant of such powers for business purposes is not the equivalent of saying that the trustees may by unfettered action further their own interests at the expense, and to the clear detriment of their cestuis que trustent. It is settled that when the personal interests of a trustee conflict with the interests of his cestui, the interest of the trustee will fall. Magruder v. Drury, 235 U.S. 106, 35 S.Ct. 77, 59 L. Ed. 151; Veterans' Administration v. Hud-

son's Estate, 169 Md. 141, 179 A. 836; Ball v. Hopkins, 268 Mass. 260, 167 N.E. 338.

■ Even if we assume that the trustees' voting power was without substantial limitation, legal phraseology may never serve as a cloak for a breach of fiduciary duty. In the words of Circuit Judge Sanborn in Jones v. Missouri-Edison Electric Co., 8 Cir., 144 F. 765, 771, "The * * * breach of trust of one who occupies a fiduciary relation while in the exercise of a lawful power is as fatal in equity to the resultant act or contract as the absence of the power."

Defendants admit in their answer that the action taken was for the purpose of perpetuating in power those in present control of the Company. Under the law of Maryland a voting trust cannot exist for more than ten years, and this action of the voting trustees was taken shortly before the expiration of this period. See Barbour v. Weld, 201 Mass. 513, 87 N.E. 909; Friedberg v. Schultz, 312 Ill.App. 171, 38 N.E.2d 182, 183; 2 Chicago-Kent Law Rev. 271. Defendants also set forth their honest belief that their actions were for the benefit of the Company.

In this connection, the words of the Court in Luther v. C. J. Luther Co., 118 Wis. 112, 94 N.W. 69, 73, 99 Am.St.Rep. 977, appear particularly apt. The Court there said:

'Nothing can be more fallacious in corporate or in popular government than the argument that because they honestly believe their policy right, and another dangerous, they may rightfully invade the field of the suffrage upon which policy rests, and disfranchise, in whole or in part, those who disagree with them."

■ Subjective good faith cannot lend validity to the acts of the trustees which operate to deprive the certificate-holders of vital rights. Industrial & General Trust v. Tod, 180 N.Y. 215, 73 N.E. 7.

We are of the opinion, and so hold, that the action taken by these trustees was beyond the limit of their authority. The motion to dismiss should therefore have been denied.

■ The judgment of the District Court will be reversed and the cause remanded for further proceedings in accordance with the views herein expressed. The amendment to the charter of June 21, 1944 should be declared void, but what further relief should be granted upon the complaint is a matter resting in the sound discretion of the District Court.

Reversed and remanded.