A. F. ADAMS, ALICE E. ADAMS and ALMERA ELECTRIC COMPANY, a Delaware corporation,
Appellants,

*vs.*

CLEARANCE CORPORATION, a Delaware corporation, ALLEN S. CRANE, RANFORD DUNLAP, THEODORE S. GARY, G. L. GRAWOLS, F. S. SPRING, EMMETT SWANSON, E. C. BLOMEYER, C. S. CADWELL, A. E. CARLSON and V. E. CHANEY, said individuals as Voting Trustees of a certain Voting Trust Agreement dated April 1, 1954 covering voting stock of GENERAL AND TELEPHONE INVESTMENTS, INC., GENERAL AND TELEPHONE INVESTMENTS, INC., a Delaware corporation, and R. E. WILLIAMS,
Appellees.

*Supreme Court, On Appeal, February 29, 1956.*

*John Van Brunt,* of Killoran & Van Brunt, Wilmington (*Miller Walton,* of Walton, Lantaff, Schroeder, Atkins, Carson & Wahl, Miami, Fla., of counsel), for appellants.

*Thomas R. Mulroy,* of Hopkins, Sutter, Halls, Owen & Mulroy, Chicago, Ill. (*Richard F. Corroon,* of Berl, Potter & Anderson, Wilmington, with him on the brief), for appellees.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice: This appeal brings up for review an order of the Vice Chancellor of September 27, 1955, denying a motion for a preliminary injunction seeking to restrain the voting of shares of a subsidiary deposited by the parent corporation in a voting trust.

The question presented is whether the voting trust is valid. It is attacked on two grounds: (1) as an unlawful delegation of the duties of the directors of the parent corporation; and (2) as an unlawful extension of a previously existing voting trust in respect of the shares of the parent corporation.

The facts are these:

A. F. Adams and Alice E. Adams control through common stock Almera Electric Company, a Delaware corporation. Almera is a family holding company owning about 53 per cent of the common stock of Clearance Corporation, another Delaware corporation. Clearance is a holding company whose principal asset is about 56 per cent of the common stock of General and Telephone Investments, Inc., also a Delaware corporation. The other outstanding stock of General is owned by other corporations. General is also a holding company. Its principal asset, prior to April 1, 1954, was about 91 per cent of the common stock of Theodore Gary and Company, a Missouri corporation. Gary at that time was also a holding company, with subsidiaries that were operating telephone utilities. Thus as of the date mentioned the Adams family, through a chain of holding companies, controlled Gary and its subsidiaries.

On June 1, 1951, a voting trust in respect to the common stock of Clearance was entered into. All of the stock of Clearance was deposited in the trust. Its purpose was stated to be the insuring of a consistent and stable policy and strong, efficient and economical management of Clearance and its subsidiaries. Eleven voting trustees were named, six of whom, including A. F. Adams, were directors of Clearance. Provisions in the agreement indicate that it was the desire and intention of the stockholders that the voting trustees should be

persons active in the management and operations of one or more of the subsidiaries of Clearance. The term of the agreement was ten years, the maximum term permitted by law. It was terminable on written notice by A. F. Adams or by holders of a majority in interest of the voting trust certificates, or by vote of a majority of the voting trustees.

On April 1, 1954, a voting trust agreement was entered into in respect of the common stock of General. The depositing stockholders were certain corporations, including Clearance, then owning all the common stock of General. The form of the Clearance voting trust agreement was followed, but the General agreement differs from the Clearance agreement in four respects: (1) there is no provision giving Adams or any single individual or corporation a. right of termination; (2) the percentage in interest of the holders of voting trust certificates required to terminate the agreement is raised to seventy-five; (3) there is added to the General voting trust a provision respecting the effect of a possible distribution to the stockholders of General of voting stock of Gary; (4) a "severability" clause is inserted respecting the effect of the possible illegality of a portion of the agreement. The same eleven persons who were voting trustees under the Clearance agreement became voting trustees under the General agreement.

The obvious purpose of the General voting trust agreement was to increase the measure of stability of the Gary enterprise by restricting the right of termination. Whereas the continuity of control sought to be achieved by the Clearance agreement depended upon the continued assent thereto of A. F. Adams, the General agreement may not be terminated without the assent of three-fourths in intent of the certificate holders, or the assent of a majority of the voting trustees. The occasion for the agreement was the contemplated refinancing of Gary and one of its subsidiaries by the sale of additional Gary stock to the public.. Negotiations to this end had been carried on during the early part of 1954 between officers of Gary and representatives of a New York underwriting firm.. The underwriters expressed concern about the stability and continuity of the management of Gary. Mr. Adams was an elderly man, and his health had

become impaired. The situation respecting control was such that upon his death, control might have devolved upon Mrs. Adams and some other women.

To deal with this situation an amendment to the Clearance agreement was suggested by Mr. Grawols, one of the voting trustees, but the idea was abandoned. According to Grawols Mr. Adams objected to this, and the idea of a voting trust agreement in respect of General stock was decided upon. This was satisfactory to the underwriters.

It does not appear what further steps were taken with respect to the proposed Gary stock issue.

In August, 1955, Mr. and Mrs. Adams and Almera (their holding company) filed suit to declare void the voting trust agreement of General. The complaint asserts three reasons in support of this action: (1) that Adams was critically ill when he signed the agreement and had never consented to it, and that the agreement was part of a fraudulent scheme on the part of the other voting trustees to seize voting control of General; (2) that the agreement is void as an unlawful delegation of the powers and duties of the directors of Clearance; and (3) that the agreement is in effect nothing but an extension of the Clearance agreement and hence is void because contrary to the express statutory provision limiting voting trust agreements to ten years.

Prior to the filing of the suit a proposal of merger of Gary into General Telephone Corporation, a New York corporation, was submitted to the management of Gary. (General Telephone Corporation is the largest independent telephone company in the country. It is not to be confused with General and Telephone Investments, Inc., the corporation herein called "General".) The plan of merger was duly approved by the boards of directors of Clearance, General and Gary on August 24, 1955, and by the voting trustees of General (Adams excepted) on September 10.

The plaintiffs moved for a preliminary injunction restraining the voting of the Gary stock in favor of the merger, and the matter

was heard on the pleadings and affidavits. On the factual issue of Adams' incompetence, the Vice Chancellor held that his probability of success on final hearing was too remote to warrant injunctive relief. Upon the legal issues he found for the defendants, holding the General voting trust to be valid.

The plaintiffs appealed. Applications for a stay was denied by the Vice Chancellor and by two justices of this Court. The merger was thereupon consummated. A motion by defendants to dismiss the appeal as moot was denied by this Court, because the legal issues (as distinct from the factual ones) are properly before us on this appeal. See 118 *A.2d* 924.

 1. The first question is whether the deposit by Clearance in the General voting trust of its shares of General stock is illegal as an unlawful delegation of the duties and powers of the Clearance directors.

Adams' argument on this point runs as follows:

The business of Clearance is the management of its only substantial asset, voting control of General, and (through General) control of Gary; to discharge this responsibility Clearance directors are required to exercise their best judgment in voting the stock of General to elect capable directors; the deposit of the stock in a voting trust has disabled them from the performance of this duty and hence is an unlawful delegation of their duties as directors.

The plaintiffs concede that a corporate stockholder may under ordinary circumstances deposit its shares in a voting trust. This is certainly correct. The language of our voting trust section of the General Corporation Law is unrestricted, and in our opinion includes corporate as well as individual stockholders. 8 *Del.C.* § 218. The section of the General Corporation Law conferring power upon a Delaware corporation to hold stock of another corporation expressly provides that the owning corporation "may exercise all the rights, powers and privileges of ownership including the right to vote thereon." 8 *Del.C.* § 123. *Cf. Day v. Hecla Mining Co.,* 126 *Wash.* 50, 217 *P.* 1, and *H. M. Byllesby & Co. v. Doriot,* 25 *Del.Ch.* 46, 12 *A.2d* 603.

Adams' argument, therefore, comes to this: although a corporation may ordinarily deposit stock in a voting trust, it may not do so if that stock represents its sole substantial asset, because by so doing the directors are delegating to third persons—the voting trustees—practically all their duties of management—the voting of the shares to insure the election of proper persons to serve as directors of the subsidiary.

In support of this argument the plaintiffs cite many cases holding that directors may not delegate their duty to manage the corporate enterprise. See, for example, *Field v. Carlisle Corp.*, 31 *Del.Ch.* 227, 68 *A.2d* 817; *Long Park v. Trenton-New Brunswick Theatres Co.*, 297 *N.Y.* 174, 77 *N.E.2d* 633; *Kennerson v. Burbank Amusement Co.*, 120 *Cal.App.2d* 157, 260 *P.2d* 823.

This general principle is well settled. It has been recently applied by the Chancellor in *Abercrombie v. Davies, ante p.* 354, 123 *A.2d* 893. It is embodied in the *Delaware Corporation Law,* 8 *Del.C.* § 141, in the following language:

> "The business of every corporation organized under the provisions of this chapter shall be managed by a board of directors, except as hereinafter or in its certificate of incorporation otherwise provided."

But how is this rule to be applied to the deposit by a corporation of shares of stock in a voting trust without thereby forbidding the deposit of *any* stock? The general rule forbidding the directors to delegate managerial duties applies as well to a delegation of a single duty as to the delegation of several or of all duties. *Field v. Carlisle Corp., supra.* Whenever any stock owned by a corporation is deposited in a voting trust, the directors of the depositary corporation have relinquished, to the extent of the stock deposited, their duty to vote the stock, and hence may be said to have delegated that duty. The supposed evil—the relinquishment of directorial supervision—that the plaintiffs find in the instant case is thus present to some extent in any case where a corporation deposits any stock in a voting trust. This delegation of duty flows directly from the divorcement of beneficial ownership from voting power, which is the very purpose

that voting trusts "are specifically devised to accomplish." *Perry v. Missouri-Kansas Pipe Line Co.,* 22 *Del.Ch.* 33, 45, 191 *A.* 823, 828. To the extent that the voting trust statute permits the delegation of the directors' duty to vote stock, it is therefore an exception to the general rule of non-delegation, carved out by the statute itself.

The plaintiff's contention is that the voting power of shares of stock owned by a corporation may be transferred to voting trustees in most cases, but not in a case where the shares are the sole corporate asset and represent control. Presumably it would follow from this contention that if a holding company has two subsidiaries it could deposit in a voting trust the shares of either but not of both. Presumably, also, it would follow that a corporation owning substantial operating assets and also controlling a stock interest in another corporation could deposit the stock in a voting trust, whereas if it did not possess other assets it could not do so. Such a distinction not only finds no support in the rule of non-delegation of duties or in the voting trust statute, but seems on its face unreasonable. To attempt to write into the law a limitation of this sort would inevitably create uncertainty in its application and invite litigation. If the statute is to be limited in its scope as a matter of law, the legislature must determine the limitations.

We think that the correct rule to apply to a case of this kind is that the directors have the legal power to deposit in a voting trust any and all shares of stock owned by their corporation, being responsible to a court of equity for the abuse of that power. This concept is fundamental in our corporation law. When the directors, or the majority stockholders, exercise a power that the general corporation law confers upon them, "it is competent for any one who conceives himself aggrieved thereby to invoke the processes of a court of equity for protection against its oppressive exercise." *Allied Chemical & Dye Corporation v. Steel & Tube Co. of America,* 14 *Del.Ch.* 1, 12, 120 *A.* 486, 491. "Notwithstanding therefore the absolute terms in which the power of the directors * * * is expressed," equity will afford protection against its wrongful use. *Bodell v. General Gas & Electric Corporation,* 15 *Del.Ch.* 119, 131, 132 *A.* 442, 447.

When an individual stockholder, owing no fiduciary duty to other stockholders, deposits stock in a voting trust, his action is seldom if ever subject to review by the courts; whereas directors so doing are fiduciaries and their action is subject to judicial scrutiny. But their legal power to do so exists.

We are cited to only one reported decision in support of the contention that the general principle of non-delegation of directors' duties overrides the statutory right of a corporation to deposit shares of a subsidiary in a voting trust.

In *Knickerbocker Investment Co. v. Voorhees,* 100 *App.Div.* 414, 91 *N.Y.S.* 816, 820, a corporation brought suit to set aside a voting trust in which it had deposited all of its shares of stock of an insurance company. The shares represented control and were its sole asset. The plaintiff made three contentions: (1) that the trust was void on its face; (2) that its execution had been obtained by fraud; and (3) that the voting trustees had been guilty of bad faith and mismanagement. A temporary injunction restraining the defendants (presumably the trustees) from voting the stock was granted and the defendants appealed. The decision of the Appellate Division appears to have been grounded upon the facts of the case. The plaintiff's charges tended to show that the organization of the investment company and the voting trust constituted a fraudulent scheme by one of the defendants and his personal or political friends to get control of the life insurance company, that they were incompetent, and that they were mismanaging the business.

After reviewing the allegations in the moving papers, the Court concluded:

> "Even the uncontroverted facts disclose an extraordinary state of circumstances, and slight evidence of bad faith may be sufficient to justify a finding that the execution of the voting trust agreement was procured by fraud."

As to the contention that the voting trust was void as a matter of law, the Court had previously said:

"The defendants contend that the voting trust agreement was made pursuant to the provisions of section 20 of the general corporation law (*Laws* 1892, p. 1807, c. 687), and that it is therefore valid and irrevocable. Doubtless a voting trust agreement made pursuant to that statute would ordinarily be valid; but on the question of whether it might not be revocable, in many instances depending on the facts, we refrain from expressing an opinion at this time. The circumstances here presented, however, appear to us to be extraordinary. If it should become necessary, the statute may be declared inapplicable to a corporation organized, as the plaintiff was, to control the operations of another through ownership of the majority of the stock; for otherwise the directors would be divested of any voice in the affairs of the corporation which they were elected to manage."

The concluding observation appears to be a dictum. If the Court had intended to lay down a rule that a voting trust in respect to controlling shares constituting the sole asset of the depositary corporation was void as a matter of law, it would not have remanded the case for a trial on the merits—as it did.

We think, therefore, that the *Knickerbocker* case is clearly an example of the abuse of directorial power, not of the lack of it. As we have above said, the power of equity to curb such abuses is inherent.

We are accordingly of opinion that the power of directors to deposit in a voting trust shares of stock of a controlled subsidiary corporation is not restricted, as a matter of law, by the principle of non-delegation of managerial duties, notwithstanding the fact that the shares represent the sole substantial asset of the corporation.

2. Plaintiffs' second contention is that the General voting trust is in substance nothing but an extension of the Clearance voting trust, and hence illegal on its face as continuing the Clearance trust for a term exceeding the ten years permitted by the statute, and illegally perpetuating the control of the Clearance voting trustees of the Gary company. If this contention is accepted, the General

trust is wholly void. *Perry v. Missouri-Kansas Pipe Line Co., supra.*

In support of this contention plaintiffs invoke the well-settled rule that a voting trust is a true trust and subject to the rules of equity in respect of trusts, *H. M. Byllesby & Co. v. Doriot, supra; Chandler v. Bellanca Aircraft Corp.*, 19 *Del.Ch.* 57, 162 *A.* 63, and the equally well-settled rule that a trustee may not encumber the trust property beyond the termination of his trust. *Scott on Trusts,* § 189.2; *Brown v. McLanahan,* 4 *Cir.,* 148 *F.2d* 703, 159 *A.L.R.* 1058. In the *Brown* case voting trustees, to perpetuate control by themselves of the management of the company, used their powers under the voting trust agreement to confer voting power on corporate debentures owned or controlled by them. This exercise of their legal powers to amend the corporate charter was held to be a gross abuse of such powers. The case therefore illustrates the distinction we have heretofore pointed out between the legal power of voting trustees and the abuse of that power.

Plaintiffs' contention in this case is that the creation of the General voting trust, though created in strict conformity with the statute, is, as a matter of law, to be construed as an attempt to extend the term of the Clearance trust. Whether or not its motive or purpose was good or bad, they say, is immaterial.

But the General trust is not a mere extension of the Clearance trust. Although it follows the scheme of the Clearance trust, the two agreements differ in the important respects noted. The principal object of each trust is the same—to insure stability of control of Gary—but the General trust accomplishes a specific purpose that the Clearance trust fails to do—it insures that the desired stability of management shall not be dependent upon the will of a single individual, Mr. Adams. A vote of three-fourths in interest of the certificate holders, or of a majority of the voting trustees, is required for termination. In the light of the surrounding circumstances— the contemplated financing of Gary—this object on its face appears entirely legitimate. (It could, of course, have been achieved by appropriate amendments to the Clearance trust. This course was sug-

gested to Mr. Adams by one of his fellow voting trustees of Clearance, but was rejected by Mr. Adams.) Secondly, an additional reason appears for the creation of the General trust. It accomplishes (or seeks to accomplish) an additional purpose—the deposit in the trust of any voting shares of Gary received by General by way of a liquidation dividend or otherwise. Finally, the depositing stockholders in the General trust are not the same as those in the Clearance trust.

The General trust therefore was not, as a matter of law. a mere extension of the Clearance trust, but was a new and independent trust, holding the stock of another corporation with different stockholders, and having independent reasons for its creation.

Plaintiffs earnestly contend that the General trust must, as a matter of law, he deemed nothing more than an extension of the Clearance trust, because, they say, the "trust *res*" is the same in each trust. This argument, as we understand it, runs as follows:

The stock of Clearance represents voting control of General, whose stock represents voting control of Gary—the sole substantial asset of this holding company system; and hence the "trust *res*" of each trust is the voting control of Gary.

This argument confuses the trust *res* proper—the property in the trust—with one of the attributes of that property, i. e., the voting rights. At bottom plaintiffs' argument comes to this—that the court should ignore the corporate fiction for the purpose of dealing with this case and treat these holding companies as one. This can always be done if necessary to prevent fraud or chicanery, but that is not the contention made in this aspect of plaintiffs' case. They say that the General trust is on its face nothing more than an unlawful extension of the Clearance trust, and with this we do not agree.

Plaintiffs say that if the General trust is sustained, judicial approval will be given to self-perpetuation in office of voting trustees of the top company of a tier of holding companies, by the expedient of creating a new trust of the stock of the next lower subsidiary in the tier shortly before the expiration of the ten-year period, and repeating the maneuver with other subsidiaries. Such a sugges-

tion presupposes the use of the statute to accomplish a selfish or other improper purpose—in effect a fraud. Any such misuse of the statutory power would be at once condemned by a court of equity. *Cf. Brown v. McLanahan, supra.* No such situation is presented in the record before us. The Vice Chancellor found, on the record so far made, that the General trust was honestly formed and is in the best interests of the stockholders of Clearance. There is nothing before us that would require us to disturb his finding.

This point of the improper use of a voting trust to bring about self-perpetuation of control is really one of fact. The complaint charges fraud and selfish motives on the part of the other voting trustees. On the record thus far made it has been resolved against the plaintiffs. But on remand the plaintiffs will be at liberty to go to final hearing and press the point further if they so desire. The same course is open to them with respect to the charge that Mr. Adams lacked the capacity to enter into the voting trust agreement. And on the issue of fraud, the defendant is at liberty to press its defense of estoppel.

We find no error of law in the decision of the court below.

The judgment of the Court of Chancery is affirmed, and the cause is remanded for further proceedings not inconsistent with this opinion.