# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HAWK INVESTMENT HOLDINGS LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0930-JTL |
| | ) | |
| STREAM TV NETWORKS, INC., and TECHNOVATIVE MEDIA, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 18, 2022
Date Decided: November 29, 2022

Steven L. Caponi, Matthew B. Goeller, Megan E. O'Connor, K&L GATES LLP, Wilmington, Delaware; *Counsel for Plaintiff Hawk Investment Holdings Ltd.*

Andrew S. Dupre, Brian R. Lemon, Stephanie H. Dallaire, Travis J. Ferguson, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Counsel for Defendants Stream TV Networks, Inc. and Technovative Media, Inc.*

**LASTER, V.C.**

Technovative Media, Inc. ("Technovative" or the "Company") is a wholly owned subsidiary of Stream TV Networks, Inc. ("Stream"). The brothers Mathu and Raja Rajan control Stream. Stream contends that Mathu is the sole director of the Company.

Hawk Investment Holdings Ltd. ("Hawk") is a secured creditor of Stream. Under a series of pledge agreements that secured Hawk's loans, Stream granted Hawk the right to vote all of its shares of Company common stock following an event of default. Hawk claims that it validly exercised its rights under the pledge agreements to remove Mathu and elect Shad L. Stastney as the sole director of the Company.

Hawk filed this action under Section 225 of the Delaware General Corporation Law (the "DGCL") to obtain a determination that Stastney was validly elected as the Company's sole director. During the initial scheduling conference, Stream challenged Hawk's ability to obtain relief on numerous grounds. In its lead argument, Stream asserted that Hawk had assigned its rights to an affiliate named SeeCubic, Inc. such that Hawk was not a real party in interest for purposes of this case. Stream posited that this issue could be addressed as a matter of law based on a package of loan documents that Hawk and SeeCubic executed in June 2022.

Stream also disputed whether its loan agreements with Hawk were valid and whether a default had occurred. Hawk responded that those issues had been resolved against Stream by a partial final judgment in earlier litigation between Stream and SeeCubic. Hawk maintained that collateral estoppel barred Stream from relitigating those issues.

Stream also asserted that Hawk's loans had been converted into equity. Hawk again invoked collateral estoppel, contending that the court had rejected a similar conversion argument and held that the conversion right required that Stream raise new equity capital before Stream could exercise it.

A Section 225 action is a summary proceeding. Although motion practice is disfavored, sometimes it can be helpful. Recognizing that the scope of the case would expand dramatically if the parties litigated the validity of the loan documents and the existence of defaults, the court scheduled an early hearing to consider the issues that the parties contended could be addressed as a matter of law. Stream responded by moving to dismiss Hawk's claims under Rules 17 and 12(b)(6). Hawk countered by moving for partial summary judgment.

This decision denies Stream's motion to dismiss under Rule 17. Stream concedes that Hawk has statutory standing to litigate this Section 225 proceeding. That makes Hawk a real party in interest for purposes of the *in rem* proceeding that Section 225 contemplates. By contrast, Stream's interpretation of the real-party-in-interest requirement would generate perverse results.

This decision also denies Stream's motion to dismiss under Rule 12(b)(6). Stream has shown that Hawk entered into an agreement that assigned all of the enforcement rights under its notes and the associated loan documents to SeeCubic. But there is a second agreement which provides that if an event of default occurs under a note purchase agreement between SeeCubic and Hawk, then Hawk can levy on all of Stream's assets, including the enforcement rights that Hawk had assigned to SeeCubic. Hawk then can

enforce those rights. An event of default occurred when the Delaware Supreme Court issued a decision adverse to SeeCubic in a related case. The default caused Hawk to regain the ability to exercise rights under the pledge agreements, which Hawk used to remove Mathu and elect Stastney.

This decision grants Hawk's motion for partial summary judgment. Collateral estoppel prevents Stream from relitigating issues that were resolved adversely to Stream by a partial final judgment in earlier litigation between Stream and SeeCubic. Those issues include (i) the validity of the loan documents under which Hawk loaned Stream millions of dollars, (ii) the existence of events of default, (iii) the fact that Hawk's loans were not converted into equity before November 10, 2021, and (iv) the requirement that Stream obtain new equity financing before gaining the ability to convert Hawk's notes into equity.

## I.      FACTUAL BACKGROUND

Between 2010 and 2020, Stream borrowed millions of dollars. Stream's senior secured creditor is SLS Holdings VI, LLC ("SLS"). Between 2011 and 2012, Stream borrowed $6 million from SLS under a series of notes (the "SLS Notes"). Stream pledged all of its assets as security for the SLS Notes and executed a security agreement that authorized SLS to levy on its assets in the event of default.

Stream's junior creditor is Hawk. Between 2010 and 2020, Stream borrowed more than £50 million from Hawk, plus additional millions denominated in dollars. The loans are documented by a total of eighteen substantively identical notes (the "Hawk Notes").[1]

In connection with the Hawk Notes, Stream executed eighteen substantially identical security agreements (together, the "Hawk Security Agreements").[2] Subject to the senior security interest held by SLS, each of the Hawk Security Agreements granted Hawk a security interest in substantially all of Stream's assets, including the Company's shares. Each of the Hawk Security Agreements authorized Hawk to levy on and take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted.

Also in connection with the Hawk Notes, Stream executed a total of fifteen substantially identical pledge agreements (together, the "Hawk Pledge Agreements").[3]

---

[1] *See* Compl. Ex. D (collecting notes). The dates of the Hawk Notes are (1) March 26, 2014, (2) October 15, 2014, (3) January 2, 2015, (4) August 6, 2015, (5) October 12, 2015, (6) February 15, 2016, (7) July 8, 2016, (8) September 27, 2016, (9) May 3, 2017, (10) December 11, 2017, (11) July 5, 2018, (12) December 6, 2018, (13) July 5, 2019, (14) September 18, 2019, (15) October 2019, without a specific day identified, (16) January 16, 2020, (17) February 26, 2020, and (18) a second note dated February 26, 2020.

[2] *See* Compl. Ex. E. The dates of the Hawk Security Agreements are (1) March 26, 2014, (2) October 15, 2014, (3) January 2, 2015, (4) August 6, 2015, (5) October 12, 2015, (6) February 15, 2016, (7) July 8, 2016, (8) September 27, 2016, (9) May 3, 2017, (10) December 11, 2017, (11) July 5, 2018, (12) December 6, 2018, (13) July 5, 2019, (14) September 18, 2019, (15) October 8, 2019, (16) January 16, 2020, (17) February 26, 2020, and (18) a second security agreement also dated February 26, 2020.

[3] *See* Compl. Ex. F. The dates of the Hawk Pledge Agreements are (1) December 17, 2014, (2) January 2, 2015, (3) August 6, 2015, (4) October 12, 2015, (5) February 15, 2016, (6) July 8, 2016, (7) September 27, 2016, (8) May 3, 2017, (9) December 11, 2017,

Each provided that if Stream defaulted under any of the Hawk Notes, then Hawk could vote the Company's shares.

In 2018, Stream and Hawk entered into an agreement which provided that the Hawk Notes would convert into equity if and when Stream raised additional equity capital (the "Hawk Conversion Agreement"). Stream and SLS contemporaneously entered into a parallel agreement governing the SLS Notes (the "SLS Conversion Agreement"). The SLS Conversion Agreement provided that it would terminate if the Hawk Conversion Agreement was amended. In April 2019, the Hawk Conversion Agreement was amended, causing the SLS Conversion Agreement to terminate.

By 2019, Stream was insolvent. In addition to the debts that Stream owed to its secured creditors, Stream carried more than $16 million in trade debt and had fallen months behind on payments to customers and suppliers. Stream even failed to make the payments necessary to maintain the patents on its technology, which are the key to Stream's potential success. In January 2020, Stream missed payroll at least once. In February, Stream managed to make payroll, but only due to an emergency infusion of capital from Hawk and a short-term loan from another investor. Stream still furloughed numerous employees.

---

(10) December 6, 2018, (11) July 5, 2019, (12) September 18, 2019, (13) October 8, 2019, (14) February 26, 2020, and (15) a second pledge agreement also dated February 26, 2020.

With Stream obviously failing, a majority of Stream's directors agreed to a friendly foreclosure with Hawk and SLS. To govern that transaction, Stream entered into an Omnibus Agreement dated May 6, 2020. Dkt. 53 Ex. B (the "Omnibus Agreement"). Under that agreement, Stream agreed to transfer all of its assets (the "Legacy Stream Assets") to SeeCubic, a newly formed entity that was majority-owned and controlled by Hawk and SLS. In the Omnibus Agreement, Hawk and SLS agreed to deem Stream's debts discharged "upon [Stream's] immediate conveyance, transfer, delivery and assignment of all right, title and interest of the Company in, to or under all of the rights, properties and assets of the Company." Omnibus Agreement § 1.1(a). Stream's other stakeholders were offered a minority equity interest in SeeCubic. *See* Dkt. 53 Ex. C.

Without the Omnibus Agreement, SLS and Hawk had the ability to levy on all of Stream's assets, leaving Stream and its stockholders with nothing. By agreeing to the Omnibus Agreement, a majority of Stream's directors achieved an outcome in which Stream's stockholders received something.

After the execution of the Omnibus Agreement, the Rajans used their voting power as the controlling stockholders of Stream to reconstitute Stream's board of directors. Having reasserted their control, they refused to comply with the Omnibus Agreement.

In September 2020, Stream filed a plenary action in this court in which it sought a declaration that the Omnibus Agreement was invalid and an injunction against SeeCubic trying to enforce it. *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, C.A. No. 2020-0766-JTL (the "Omnibus Agreement Litigation"). SeeCubic filed counterclaims which sought

6

a declaration that the Omnibus Agreement was valid and an injunction against anyone trying to interfere with it.

In December 2020, this court issued a decision in the Omnibus Agreement Litigation that rejected Stream's challenges to the Omnibus Agreement. The court ruled that it was reasonably probable that the Omnibus Agreement was a valid and enforceable agreement, and the court issued an injunction barring Stream from failing to comply with the agreement. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "Injunction Decision") (subsequent history omitted).

After the issuance of the Injunction Decision, SeeCubic acquired the Legacy Stream Assets. Using funds provided by Hawk and SLS, SeeCubic built a business based on the Legacy Stream Assets.

In September 2021, the court granted SeeCubic's motion for summary judgment in the Omnibus Agreement Litigation. The resulting decision declared the Omnibus Agreement to be valid and entered a permanent injunction barring Stream from interfering with it. On November 10, 2021, the court entered a partial final judgment in favor of SeeCubic. Omnibus Agreement Litigation, Dkt. 204 (the "First Partial Final Judgment") As of that date, neither the Hawk Notes nor the SLS Notes had been converted into equity, and the notes remained outstanding.

Stream appealed the First Partial Final Judgment. While the appeal was pending, Hawk and SLS documented their loans to SeeCubic by entering into a new note purchase agreement effective as of June 11, 2022. *See* Dkt. 53 Ex. D (the "Note Purchase Agreement"). Under the Note Purchase Agreement, SeeCubic issued notes with a face

value of $117,875,781.64 to various purchasers, including notes to Hawk with a face value of $56,293,255.13 and notes to SLS with a face value of $6,514,023. In exchange, the noteholders received a first-priority security interest in all of SeeCubic's assets, including the Legacy Stream Assets.

In conjunction with the Note Purchase Agreement, Hawk and SLS entered into an agreement with SeeCubic titled "Assignment of Enforcement Rights and Related Proceeds." Dkt. 53 Ex. E (the "Assignment Agreement"). Through that agreement, Hawk and SLS transferred their rights as creditors to SeeCubic, thereby consolidating those rights within a single entity.

Also in conjunction with the Note Purchase Agreement, SeeCubic entered into a Guarantee and Collateral Agreement with Hawk. Dkt. 53 Ex. F (the "Collateral Agreement"). Under that agreement, SeeCubic granted Hawk a security interest in all of its assets, including all of its contract rights. *Id.* §§ 3, 3.1(h), 4.1. If an event of default occurred under the Note Purchase Agreement, the Collateral Agreement empowered Hawk to act as the "Collateral Agent" to levy on SeeCubic's assets and enforce its contract rights, including the rights SeeCubic received under the Assignment Agreement. *See id.* art. 7. The issuance of a decision invalidating the Omnibus Agreement constituted an event of default under the Note Purchase Agreement.

On June 15, 2022, the Delaware Supreme Court vacated the First Partial Final Judgment and held that the Omnibus Agreement could not have become effective without the approval of Stream's Class B stockholders. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022) (the "Supreme Court Decision"). The issuance of the

8

Supreme Court Decision constituted an event of default under the Note Purchase Agreement.

Stream contended that the Supreme Court Decision necessitated the rescission of all of the transactions effectuated under the Omnibus Agreement, along with all of the actions that SeeCubic had taken under the color of the Omnibus Agreement. SeeCubic responded that it had other claims against Stream, including derivative claims for breach of fiduciary duty that it could assert because it had received the rights to enforce the Hawk Notes and the SLS Notes under the Assignment Agreement. SeeCubic only attempted to assert derivative claims for breach of fiduciary duty; it did not attempt to assert the creditors' contractual enforcement rights.

On August 7, 2022, this court entered a partial final judgment which determined that the Omnibus Agreement was "without legal effect." Omnibus Agreement Litigation, Dkt. 266 ¶ 1 (the "Second Partial Final Judgment"). The entry of the Second Partial Final Judgment also constituted an event of default under the Note Purchase Agreement.

The Second Partial Final Judgment specifically determined that "the Omnibus Agreement did not validly transfer legal title to any [of the Legacy Stream Assets] from Stream to SeeCubic." *Id.* ¶ 3. The Second Partial Final Judgment thus rescinded the transactions between SeeCubic and Stream. The court directed the parties to cooperate to effectuate the Second Partial Final Judgment, including "by causing SeeCubic to transfer legal title to the [Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." *Id.* ¶ 4.

9

The Second Partial Final Judgment included an injunction designed to ensure that SeeCubic received its assets back before secured creditors like Hawk and SLS began enforcing their creditors' rights. The pertinent language stated: "Pending transfer of the [Legacy Stream Assets] from SeeCubic to Stream, SeeCubic and all those acting in concert with it shall not use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream." *Id.* ¶ 5. At the same time, the Second Partial Final Judgment made clear that the secured creditors retained their rights and that "[n]othing herein shall prejudice any of the claims asserted in SeeCubic's Verified Supplemental Counterclaims, Derivative Complaint, and Third-Party Complaint (Dkt. 241) nor any right that SeeCubic or any party acting in concert with SeeCubic may have separate and apart from the Omnibus Agreement." *Id.* ¶ 9.

No one appealed the Second Partial Final Judgment. That order became final.

The parties proved unable to work cooperatively to rescind the transactions effectuated under the Omnibus Agreement. Eventually, the court issued an order declaring Stream to be the sole owner of the Company's equity. Omnibus Agreement Litigation, Dkt. 318 ¶¶ 1–2. The same order included an injunction which provided that

> [f]or a period of ten days, SeeCubic, Hawk, Stastney, and anyone acting in concert with them are enjoined from taking any action that would interfere with either Stream's ownership of the Shares or Stream's exercise of rights associated with the Shares. In accordance with Court of Chancery Rule 6, the injunction will lift on Monday, October 17, 2022, at 9:00 a.m., at which point SeeCubic, Hawk, Stastney, and anyone acting in concert with them may exercise any rights or remedies that they believe they have regarding the Shares.

10

*Id.* ¶ 4. The injunction expired by its terms on October 17, 2022. *See* Omnibus Agreement Litigation, Dkt. 344.

After the injunction expired, Hawk purported to exercise its rights under the Hawk Pledge Agreements by voting the shares of the Company to remove Mathu as sole director and replace him with Stastney. Hawk then filed this lawsuit to confirm the validity of those actions. Having witnessed first-hand the parties' inability to work together, the court appointed Ian Liston, Esq., as receiver pendente lite to maintain the status quo (the "Receiver"). Dkt. 12. The Receiver and his team have done an outstanding job stabilizing the Company and maintaining the status quo, and the court is grateful for their efforts.

## II.     RULE 17(a)

Invoking Rule 17(a), Stream contends that this Section 225 action must be dismissed because Hawk is not the real party in interest. According to Stream, Hawk transferred all of its interest in the Hawk Notes, the Hawk Security Agreements, and the Hawk Pledge Agreements to Stream under the Assignment Agreement. Stream contends that as a result of that transaction, SeeCubic rather than Hawk is the real party in interest and must bring the action under Rule 17(a). Although that issue might seem easily curable, Stream further argues that adding SeeCubic to this action cannot cure the problem because SeeCubic lacks statutory standing under Section 225. The result is a procedural Catch-22 in which no one on the creditors' side of the dispute can pursue a Section 225 action to enforce the rights they obtained under the Hawk Pledge Agreements. This too-clever conundrum does not require dismissal.

11

Rule 17(a) states:

> Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought; but in those cases in which the bringing of an action for the use or benefit of another is the subject of statutory regulation, the action shall be brought as provided by statute. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Ct. Ch. R. 17(a).

The real-party-in-interest requirement seeks to have litigation "brought by the person who, according to the governing substantive law, is entitled to enforce the right." 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1543 (3d ed.), Westlaw (database updated Apr. 2022). "Thus, the action will not necessarily be brought in the name of the person who ultimately will benefit from the recovery." *Id.* "One of the main purposes of Rule 17 is to protect a defendant from duplicative and unnecessary litigation." *NorthPointe Hldgs., LLC v. Nationwide Emerging Managers, LLC,* 2012 WL 2005453, at *6 (Del. Super. May 24, 2012). The rule enables the defendant to invoke all the defenses that can be raised against the real party in interest and ensures that any judgment entered in the action will have preclusive effect. *Cammile v. Sanderson*, 101 A.2d 316, 319 (Del. Super. 1953); *see* Wright & Miller, *supra*, § 1543.

The real-party-in-interest requirement has particular relevance when there has been an assignment of a claim. At common law, an assignee did not hold legal title to the

12

claim and could not sue. The real-party-in-interest requirement developed in large part to modify this restrictive rule. Wright & Miller, *supra*, § 1545. "Under present law an assignment passes the title to the assignee so that the assignee is the owner of any claim arising from the chose and should be treated as the real party in interest under Rule 17(a)." *Id.*

When determining the effect of an assignment on a party's ability to sue as a real party in interest, a court generally must consider three issues. First, the court must examine what has been assigned to determine who holds the right to assert the claim. *Id.* Second, the court must evaluate whether a valid assignment has been made. *Id.* Third, the court must look to whether there has been a complete or partial assignment of the claim. If there has been only a partial assignment, then "the assignor and the assignee each retain an interest in the claim and are both real parties in interest." *Id.*

Stream's contention that Hawk is not a real party in interest fails at the first stage of the analysis. The right in question is the ability to pursue a claim under Section 225. Rule 17(a) states that "a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought." Ct. Ch. R. 17(a). Section 225(a) provides that "[u]pon application of any stockholder or director, or any officer whose title to office is contested, the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director of officer of any corporation, and the right of any person to continue to hold such office . . . ." 8 *Del. C.* § 225(a).

Under this regime, the plaintiff in a Section 225 action does not have to be the party that exercised the voting power or other authority necessary to achieve the election, appointment, removal, or resignation of the director. Any stockholder or any director can bring the Section 225 action, as can any officer whose title to office is contested. "Section 225 empowers any stockholder . . . to institute proceedings under the statute, regardless of the size of the holdings of that stockholder and irrespective of whether the shares held have voting rights in connection with the disputed contest." Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.09[c], at 9-228 (2d ed. 2021). Likewise, any director can institute the proceeding, "whether or not a claimant to a contested position and without regard to the allegations of the application as to the legitimacy of the election." *Id.* As leading commentators explain,

> This is a logical regime. Whether or not directly involved in the dispute at hand, all stockholders, given their ownership interest, and all putative directors, given their fiduciary responsibilities to the corporation as a whole, have a tangible interest in avoiding the potentially paralytic effect upon the enterprise of disputes that call into question the legitimacy of those who would act on its behalf.

*Id.*

Stream concedes that Hawk has statutory standing as a stockholder of Stream to pursue this Section 225 proceeding. Dkt. 71 at 52. That concession ends the analysis under Rule 17(a), because the rule expressly states that "a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is

14

brought." Ct. Ch. R. 17(a). The fact that Hawk has statutory standing to bring the Section 225 proceeding means that for purposes of that claim, Hawk is a real party in interest.[4]

The nature of a Section 225 action supports this outcome. A Section 225 action is an *in rem* proceeding. *Genger v. TR Invs., LLC*, 26 A.3d 180, 200 (Del. 2011). The *res* in question is the corporate office. The court takes jurisdiction over the corporate office. Parties with standing under Section 225 can appear and litigate who has title to the corporate office. *Id.* at 199–200 (noting that "the 'defendants' are before the court, not individually, but rather, as respondents being invited to litigate their claims to the *res* (here, the disputed corporate office) or forever be barred from doing so"). The unique nature of a Section 225 action already achieves the policy goals that Rule 17(a) seeks to achieve in terms of avoiding duplicative litigation and ensuring that the judgment has binding effect. By virtue of its status as an *in rem* proceeding, the outcome of the Section 225 action is binding as to the world with respect to the determination of title to corporate office and the issues necessary to adjudicate that issue. Not surprisingly, no decision has ever applied Rule 17(a) in the context of a Section 225 proceeding or its alternative entity analogs.

---

[4] Without that concession, there could be debate about whether a stockholder of a parent corporation would have standing under Section 225 to litigate a dispute over title to office at the parent corporation's wholly owned subsidiary. There is a strong argument that Hawk would have statutory standing, because the term "stockholder" for purposes of Section 225 has been construed broadly to include holders of beneficial interests. *See, e.g.*, *Chandler v. Bellanca Aircraft Corp.*, 162 A. 63, 75 (Del. Ch. 1932) (Wolcott, C.). The court need not confront that issue in this case.

If credited, Stream's real-party-in-interest argument would lead to pernicious results. In Stream's view, the only viable plaintiff in this case would be a party who both has standing under Section 225(a) and who exercised the voting rights under the pledge agreement. As Stream sees it, Hawk cannot meet that test, because Stream believes Hawk assigned its rights under the Hawk Pledge Agreements and cannot exercise them. For the same reason, Stastney could not sue because he indisputably never purported to exercise any rights under the Hawk Pledge Agreements. And SeeCubic cannot sue because it lacks statutory standing. The convenient result for Stream is that no one can enforce the rights under the Hawk Pledge Agreements that Stream granted to its creditors. Nor is this a unique scenario. Stream's interpretation will create this problem whenever a party that lacks statutory standing nevertheless exercises a right to appoint a director or officer. Creditors frequently receive voting rights through proxies or pledge agreements, and they can be given voting rights directly under Section 221 of the DGCL. Any time a creditor exercised those rights, Stream's rule would prevent the creditor from enforcing its rights through a Section 225 action unless the creditor coincidentally also happened to be a stockholder. And although Stream has not advanced the argument in this case, the same issue could arise in a 100% controlled subsidiary whenever a party other than the controller had the power to exercise voting rights, whether under a pledge agreement, irrevocable proxy, or otherwise.

The purpose of a Section 225 action "is to provide a quick method for review of the corporate election process to prevent a Delaware corporation from being immobilized by controversies about whether a given officer or director is properly holding office." *Box*

16

*v. Box*, 697 A.2d 395, 398 (Del. 1997). Delaware has a substantial policy interest in ensuring that Section 225 is available to serve that purpose. Enforcing the plain language of Section 225 achieves that purpose by establishing a regime in which any party with statutory standing can litigate the validity of the exercise of voting rights, even if they are not the party that exercised the voting rights or would benefit from a favorable determination. *See Genger*, 26 A.3d at 199 (noting that a party to a Section 225 action can litigate any issue that affects title to office or the outcome of the vote); *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999) (same), *aff'd as modified*, 737 A.2d 530 (TABLE), 1999 WL 636634 (Del. 1999).

Stream makes a different policy argument. According to Stream, "the Delaware General Corporation Law is the wrong litigation device for monetary claims for breach of convertible debt contracts." Dkt. 53 at 2. That contention misses the mark. This litigation is not about a monetary claim. It is about the right to vote the Company's shares of common stock under the Hawk Pledge Agreements, which Stream granted as an inducement to receiving millions of dollars in loans. Stream's misguided policy argument would enable a borrower to secure loans on the basis of a pledge agreement, then escape the enforcement of the pledge agreement through a convoluted interpretation of Section 225.

Stream also relies heavily on *SolarReserve CSP Holdings, LLC v. TonopahSolar Energy, LLC*, 2020 Wl 4251968 (Del. Ch. Jul. 24, 2020), *order vacated, appeal dismissed*, 258 A.3d 806 (Del. 2021). That decision rejected an effort by a former unitholder in an LLC to enforce a right to inspect books and records that only a

17

unitholder could assert, finding that the unitholder had assigned all of its rights to a third party. The court understandably held that in light of the assignment, the former unitholder no longer had the ability to pursue a books and records action. *Id.* at *4. The right to bring the books and records action rested with the holder of the units, and the action only could be brought by the party that sought to exercise that right. Those facts bear no similarity to this case, which involves an *in rem* Section 225 proceeding, where Hawk's statutory standing to pursue the action is undisputed, and where a party seeking a determination under Section 225 need not be the party that exercised the voting rights that gave rise to the dispute.

Hawk has statutory standing to bring a Section 225 action. Hawk is therefore a real party in interest for purposes of Rule 17.

### III.       RULE 12(b)(6)

In addition to attempting to invoke Rule 17(a), Stream seeks dismissal under Rule 12(b)(6). When considering a Rule 12(b)(6) motion, this court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.* None of Stream's Rule 12(b)(6) arguments warrant dismissal.

18

## A.      The Assignment Agreement Argument

In its first argument for dismissal under Rule 12(b)(6), Stream again relies on Hawk transferring all of its rights under the Hawk Notes and the related loan documents. The premise is simple: If Hawk assigned all of its rights, then Hawk could not have invoked the Hawk Pledge Agreements to remove Mathu as a director and fill the resulting vacancy with Stastney. The plain language of the Assignment Agreement establishes that Hawk transferred all of its rights under the Hawk Pledge Agreements to SeeCubic, and if the analysis stopped there, then Stream would prevail. But Hawk has shown that under the plain language of the Note Purchase Agreement and the Collateral Agreement, Hawk has the ability to exercise SeeCubic's contractual rights, including SeeCubic's rights under the Assignment Agreement.

### 1.      The Plain Language Of The Assignment Agreement

The plain language of the Assignment Agreement makes clear that Hawk assigned all of the enforcement rights associated with the Hawk Notes and related loan documents, including the Hawk Pledge Agreements. If the Assignment Agreement were the only document at issue, then Stream's motion to dismiss would succeed.

Section 1 of the Assignment Agreement makes this clear. It states:

In consideration for the covenants and agreements contained in the Note Purchase Agreement, each Assignor [*i.e.*, Hawk and SLS] hereby irrevocably assigns, transfers, conveys and delivers, to the Assignee [*i.e.*, SeeCubic] with no reversionary interest whatsoever therein, and the Assignee hereby accepts and assumes, to have and to hold forever, the exclusive right to

(a) administer, exercise remedies and enforce all rights of such Assignor under the Security Agreements . . ., including the right to sell, assign,

19

surrender, collect, assemble, foreclose on and/or institute legal proceedings with respect to (i) the Collateral under the Security Agreements and/or (ii) the Stream Notes Documentation, and

(b) all proceeds, cash or otherwise, from the collection, foreclosure or enforcement of such Assignor's interest in the Collateral or under the Security Agreements . . ., the other Stream Notes Documentation, the Uniform Commercial Code, the Bankruptcy Code and other applicable law or any of its other interests, rights, powers or remedies.

Assignment Agreement § 1 (formatting added). The definition of "Security Agreements" encompasses the Hawk Pledge Agreements. *Id.* at 1.

The plain language of this provision states that Hawk "irrevocably assigns, transfers, conveys, and delivers" to SeeCubic "the exclusive right to" engage in a list of actions, including "exercise remedies and enforce all rights . . . under the Security Agreements." *Id.* § 1. Hawk thus transferred "irrevocably" and "exclusive[ly]" to SeeCubic, "to have and to hold forever," Hawk's rights under the Hawk Pledge Agreements. *Id.*

Underscoring the point, the Assignment Agreement provides that Hawk and SLS cannot not take any action under the various loan documents unless SeeCubic directs them to take that action. After listing a series of eight broad categories of actions that SeeCubic can take to enforce the Hawk and SLS loan documents, the Assignment Agreement states:

No Assignor [*i.e.*, Hawk and SLS] shall take any of the above actions, or commence any exercise of remedies or any foreclosure actions, or otherwise take any action or proceeding against any of the Collateral . . . unless and until such Assignor shall have been directed by written notice from the Assignee [*i.e.*, SeeCubic] and then only in accordance with the provisions of this Assignment Agreement.

20

*Id.* § 3. This provision would not make sense if Hawk and SLS retained enforcement rights that they could exercise independently.

To negate this reasoning, Hawk argues that the Assignment Agreement did not contemplate a complete assignment to SeeCubic of all of its rights under the Hawk Notes and associated loan documents. As evidence of a partial assignment, Hawk cites a provision in the Assignment Agreement in which Hawk and SLS agreed to turn over to SeeCubic any proceeds that they received. That provision states:

> Each Assignor [*i.e.*, Hawk and SLS] shall remit all cash and non-cash proceeds received by such Assignor, and transfer to the Assignee [*i.e.*, SeeCubic] any assets obtained, from any collection and/or foreclosure with respect to, or enforcement of any Assignors' [sic] respective interests in, the Collateral under the Security Documents . . . or in the other Stream Notes Documentation, or derived from any of any Assignor's other interests, rights, powers or remedies assigned to the Assignee herein.

*Id.* § 2 (the "Turnover Provision"). Hawk wonders how the Turnover Provision could have any meaning unless Hawk retained the right to engage in collection, foreclosure, or enforcement actions such that it could acquire cash and non-cash proceeds.

There is an obvious answer. In the Assignment Agreement, Hawk and SLS agreed that SeeCubic could instruct Hawk or SLS to take action in their own names to enforce the Hawk Security Agreements. The operative language states:

> In addition to the Assignee's direct rights to act as set forth therein, in exercising rights and remedies with respect to the Collateral . . ., the Assignee may, and each Assignor hereby agrees that the Assignee may,
>
> (i) . . . instruct each Assignor to enforce or refrain from enforcing, the provisions of the Security Agreements . . . or other Stream Notes Documentation, or

21

(ii) instruct each Assignor to exercise or refrain from exercising any rights and remedies thereunder . . . .

*Id.* § 3 (formatting added). If SeeCubic instructed Hawk to take action in its own name, then Hawk could end up with proceeds. At that point, Hawk would have an obligation under the Turnover Provision to turn over those proceeds to SeeCubic. The same would be true if Stream or one of its subsidiaries made a payment to Hawk or SLS rather than to SeeCubic by mistake.

Stream has thus shown that Hawk transferred all of its enforcement rights to SeeCubic, including Hawk's rights under the Hawk Pledge Agreements. If the Assignment Agreement were the end of the story, then Hawk lacked authority to attempt to enforce the Hawk Pledge Agreements without a specific instruction from SeeCubic. In that scenario, the plain language of the Assignment Agreement requires dismissal of Hawk's claims.

### 2. The Plain Language Of The Collateral Agreement

The plain language of the Assignment Agreement does not carry the day because there are other agreements in the record. Hawk regained the ability to exercise rights under the Hawk Pledge Agreements by virtue of the Note Purchase Agreement and the Collateral Agreement.

The Collateral Agreement appointed Hawk as Collateral Agent with the authority following an event of default under the Note Purchase Agreement to assert any rights that the note purchasers possessed under the Note Purchase Agreement or in the Collateral Agreement. Those rights included a security interest in all of SeeCubic's assets, which

22

encompassed to "all General Intangibles (including all contract rights)." Collateral Agreement § 3.1(h). The security interest thus extended to the enforcement rights that SeeCubic received under the Assignment Agreement, which in turn included SeeCubic's right to enforce the Hawk Pledge Agreements.

If an event of default occurred under the Note Purchase Agreement, then Hawk gained the right to take possession of the contractual enforcement rights and exercise them in SeeCubic's name or its own. The relevant language states:

> [SeeCubic] hereby irrevocably constitutes and appoints the Collateral Agent . . ., effective upon and solely during the continuance of an Event of Default, as its true and lawful attorney-in-fact with full irrevocable power and authority in [its] place and stead . . . and in [its] name . . . or in its own name, . . . to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement . . . .

*Id.* § 7.1(a). In addition to this general grant of authority, the provision specifically gives the Collateral Agent the power to:

> (3) sign and indorse any . . . documents in connection with any of the Collateral;
>
> (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral;
>
> . . . and;
>
> (8) generally . . . make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and do at the Collateral Agent's option . . ., at any time, or from time to time, all acts and things which the Collateral Agent deems necessary to protect, preserve or realize upon the its [sic] security interests therein and to effect the intent of this Agreement, all as fully and effectively as [SeeCubic] might do . . . .

*Id.* § 7.1(a)(v) (formatting added).

23

Section 10(i) of the Note Purchase Agreement states that an Event of Default exists if "there occurs the filing of any judgment or order (whether or not final) disputing or invalidating the Omnibus Agreement." Note Purchase Agreement § 10(i). It is undisputed that an Event of Default took place under the Note Purchase Agreement when the Delaware Supreme Court declared the Omnibus Agreement to be invalid. The Second Partial Final Judgment confirmed the existence of an Event of Default.

After the issuance of the Supreme Court Decision, Hawk had the power to exercise SeeCubic's rights under the Assignment Agreement by enforcing the Hawk Pledge Agreements. Hawk had the power to do so in SeeCubic's name or, as it did, in its own name. Because of the Collateral Agreement and the occurrence of an Event of Default under the Note Purchase Agreement, Hawk's original assignment of its enforcement rights under the Assignment Agreement does not mandate the dismissal of Hawk's claims.

### 3. The Non-Transferability Argument

For the sake of completeness, this decision addresses and rejects Hawk's alternative argument that it retained its rights under the Hawk Pledge Agreements because the Hawk Notes were non-assignable. That argument falls short because (i) Hawk focuses on the wrong agreement, and (ii) Stream can consent to the assignment, which it has done by conduct.

Each of the Hawk Notes contains a provision stating: "Neither party shall assign or transfer its rights under this Note without the prior written consent of the other party . .

24

. . ."[5] Hawk argues that this provision prevented Hawk from transferring any rights it possessed under the Hawk Pledge Agreements.

There is an obvious contractual mismatch between an anti-assignment provision in the Hawk Notes and an assignment of rights under the Hawk Pledge Agreements. Hawk claims that the Hawk Notes incorporate the Hawk Pledge Agreements by reference because fifteen of the eighteen Hawk Notes contain the following language:

> The obligations of [Stream] under this Note are secured by the assets of the Company pursuant to that security agreement dated as of the Issue Date between [Stream] and [Hawk] (the "**Security Agreement**") and the Pledge Agreement in the form appearing as Exhibit D. In the event that a subsidiary of [Stream] comes into existence, [Stream] will promptly procure that each and every subsidiary enters into such security [sic] for the benefit of [Hawk], as [Hawk] shall reasonably require. [Hawk's] costs in relation to the provision of such security shall by borne by [Stream].

Hawk Note § 19, Ex. D. This provision does not incorporate the attached Hawk Pledge Agreement into the pertinent Hawk Note, nor does it cause the anti-assignment provision in the Hawk Note to extend to the terms of the Hawk Pledge Agreement.

To determine whether any limitations exist on the assignment of rights under the Hawk Pledge Agreements, one must look to the Hawk Pledge Agreements. Those agreements do not contain any language limiting their assignment. The only section that touches on the issue contains standard successor-and-assigns language: "Successors and Assigns. This Agreement shall be binding upon the successors and assigns of each

---

[5] In the first three Hawk Notes, this provision appears in Section 19. In the later Hawk Notes, the same language appears in Section 20.

Pledgor and shall inure to the benefit of Hawk and their [sic] successors and assigns." Hawk Pledge Agreements § 12. Far from limiting the assignment of rights, this provision contemplates assignment. Hawk thus could and did assign its rights under the Hawk Pledge Agreements to SeeCubic.[6]

Another problem with Hawk's argument is that even if the anti-assignment clause in the Hawk Notes encompassed the Hawk Pledge Agreements, Stream could consent to the assignment. The anti-assignment provision in the Hawk Notes states that rights cannot be transferred without the other party's consent. That means that Stream can consent to the assignment. Stream has now argued affirmatively in this proceeding that the Hawk Notes and all of the rights under the associated loan documents were assigned to SeeCubic. Stream has thus consented to the assignment, and Hawk cannot now contend that it never took place.[7]

---

[6] Another strike against Hawk's argument is the language of the Hawk Security Agreements. Hawk's reasoning about the Hawk Pledge Agreements being incorporated by reference into the associated Hawk Notes and subject to the anti-assignment provision in the Hawk Notes should apply equally to the Hawk Security Agreements, because the anti-assignment provision refers to those agreements as well. Yet Section 5.1 of the Hawk Security Agreements contains a different anti-assignment provision that restricts Stream from assigning its rights without Hawk's consent but does not restrict Hawk's assignment of its rights. It is not reasonable to construe the anti-assignment provision in the Hawk Notes as overriding the different anti-assignment clause in the Hawk Security Agreements. It follows that the drafters of the Hawk Notes did not intend the anti-assignment provision in the Hawk Notes to apply to anything other than the Hawk Notes.

[7] The court makes this ruling while recognizing that Stream previously took a contrary position. After the Delaware Supreme Court issued its decision invalidating the Omnibus Agreement, SeeCubic sought to amend its complaint to assert derivative claims against Stream on the theory that SeeCubic was a creditor of Stream and that Stream was

26

## B.     The Second-Lien Creditor Argument

Stream's second argument for dismissal is a strained one. Stream contends that Hawk is barred from enforcing its rights as a creditor because SLS has asserted a foreclosure action in the Delaware Superior Court, captioned *SLS Holdings VI, LLC v. Stream TV Networks, Inc.*, C.A. No. N20C-03-225 MMJ CCLD (Del. Super. Mar. 23, 2020) (the "Superior Court Action"). Stream argues that as a junior creditor, Hawk cannot take action in the face of enforcement efforts by a senior creditor.

The Uniform Commercial Code expressly contemplates this situation and authorizes a junior secured creditor to pursue remedies against, foreclose on, and liquidate collateral that is subject to a superior interest. The senior security interest persists and attaches to the sale proceeds. *See* 6 *Del. C.* § 9-617(a) ("A secured party's disposition of collateral after default: . . . (3) discharges any subordinate security interest or other subordinate lien."); 6 *Del. C.* § 9-610, cmt. 5 ("Because the disposition by a junior would not cut off a senior's security interest or other lien (see Section 9-617), in

---

insolvent. Omnibus Agreement Litigation, Dkt. 230. To establish its status as a creditor, SeeCubic pointed to its rights under the Assignment Agreement. *Id.*, Dkt. 232 Ex. 1 at 3 n.1 ("Pursuant to an agreement dated June 11, 2022, SLS Holdings VI, LLC ("SLS") and Hawk Investment Holdings ("Hawk," with SLS, the "Secured Creditors")—Stream's secured creditors—assigned certain of their rights, including the right to pursue claims through litigation, to SeeCubic. SeeCubic therefore has standing to maintain derivative claims against the directors of Stream on behalf of the Company."). SeeCubic opposed the motion to amend on jurisdictional grounds, but also argued that no assignment had taken place and that SeeCubic could not assert claims as a creditor. *Id.*, Dkt. 234 ¶¶ 13, 18. Although this prior incident reveals Stream's willingness to take positions of convenience, it does not change the fact that Stream has now clearly endorsed the assignment of the Hawk Notes to SeeCubic.

many (probably most) cases the junior's receipt of the cash proceeds would not violate the rights of the senior."). The fact that SLS and Hawk have both taken steps to pursue their collateral is not a bar to this action.

Nor is there anything about the Superior Court Action that would prevent this Section 225 action from moving forward. In the Superior Court Action, SLS seeks (a) a money judgment against Stream, (b) replevin of the collateral securing the SLS Notes, (c) a money judgment against the guarantors of Stream's debt to SLS, and (d) replevin of the collateral pledged by the guarantors. The Superior Court Action thus involves different debt instruments and seeks different remedies. Moreover, nothing is happening in the Superior Court Action. Although the case remains pending, there have been no filings by any of the parties since June 1, 2021.

The existence of the Superior Court Action is not a basis for dismissal.

## C. The Discovery Abuse Argument

Stream's third argument seeks dismissal on the theory that Hawk has engaged in discovery abuse. The court authorized limited discovery in preparation for the initial hearing. Stream insisted on deposing Robert Morton, whom Stream contends is the principal of Hawk, but who lives in the United Kingdom. Morton is thus outside of this court's jurisdiction, although the court could compel Hawk to testify through Morton to the extent he was a director, officer, or managing agent of Hawk. Hawk offered a Rule 30(b)(6) deponent in lieu of Morton, and Stream moved to compel Morton to appear.

The court accepted Hawk's representation that Morton was not a director, officer, or management agent of Hawk and directed Hawk to produce a Rule 30(b)(6) witness

28

who had been prepared to testify about the negotiation of the Assignment Agreement and about who exercised decision-making authority at Hawk. The court warned Hawk that it faced potential discovery sanctions if the Rule 30(b)(6) witness turned out to be inadequate or if the record showed that Morton was a director, officer, or managing agent of Hawk. Facing that risk, Hawk asked whether Stream would object if it produced Morton, even if Morton turned out to be a tangential witness. Stream agreed not to object, and Hawk produced Morton. He turned out not to have been meaningfully involved in the negotiation of the Assignment Agreement, and he also suffered from health and memory problems associated with advanced age. The deposition lasted only one hour because it was evident to everyone that Morton was having difficulty.

Now, Stream has gone back on its promise and claims that producing Morton constituted discovery abuse. That argument is meritless. Hawk produced Morton, just as Stream wanted. At this point, Stream may well regret its decision to insist on Morton rather than the Rule 30(b)(6) witness that Hawk offered. That is not a basis for a discovery sanction. It is certainly not a basis for dismissal.

## IV.      RULE 56

Hawk has cross-moved for summary judgment establishing (i) the validity of the debt reflected by the Hawk Notes; (ii) Stream's default on the Hawk Notes; (iii) the validity of Hawk's creditor rights; and (iv) the condition predicate that Stream must satisfy to convert the Hawk Notes into equity. Each of these issues has been decided against Stream by the Second Partial Final Judgment. Under principles of collateral

estoppel, those rulings bind Stream. Summary judgment on these issues is therefore granted.

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). When a party moves for summary judgment, "the court must view the evidence in the light most favorable to the non-moving party." *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992). There are no disputes of fact associated with Hawk's invocation of collateral estoppel, making summary judgment an appropriate vehicle for deciding the issue.

"[T]he doctrine of collateral estoppel provides repose by preventing the relitigation of an issue previously decided. In addition, by putting an end to litigation, it conserves judicial resources." *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1216 (Del. 1991). The Delaware Supreme Court has stated "where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action." *Id.* (quoting *Tyndall v. Tyndall*, 238 A.2d 343, 346 (Del. 1968)). Under Delaware law, collateral estoppel can apply without complete mutuality of parties so long as the party to be collaterally estopped had a full and fair opportunity to litigate the issue in the first action. *Id.* at 1217 ("Delaware, like many other jurisdictions, has abandoned the requirement of mutuality as a prerequisite to the assertion of collateral estoppel . . . It is sufficient that the party against whom collateral estoppel is asserted was a previous party.").

30

A party must show that the following elements are met to invoke collateral estoppel:

(1) the issue previously decided is identical to the issue at bar;

(2) the prior issue was finally adjudicated on the merits;

(3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and

(4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*City of Newark v. Unemployment Ins. Appeal Bd.*, 802 A.2d 318, 324 (Del. Super. 2002) (formatting added).

In this case, the doctrine of collateral estoppel prevents Stream from relitigating the following issues:

- Hawk holds secured debt in Stream;

- Stream defaulted on that debt;

- Hawk has valid creditor rights;

- Stream cannot convert that secured debt to equity without raising additional capital; and

- as of November 10, 2021, Stream had not converted the secured debt.

Each of these issues was litigated in the Omnibus Agreement Litigation and resulted in a final decision on the merits. This court's factual findings in the Injunction Decision included the following:

- Hawk holds secured debt in Stream: "Stream executed a security agreement in connection with the Hawk Notes, which authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted." Injunction Decision, 250 A.3d at 1023.

31

- Stream had defaulted on its debt: "Stream had defaulted on more than $50 million in debt to its secured creditors, owed another $16 million to trade creditors, and could not pay its bills as they came due." *Id.* at 1020.

- Hawk has valid and enforceable creditor rights: "Stream's secured creditors already held security interests in all of Stream's assets and had the right to foreclose on those assets." *Id.* Hawk was the "junior secured creditor," in whose favor "Stream pledged all of its assets as security for the Hawk Notes," and "Stream executed a security agreement in connection with the Hawk Notes, which authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted." *Id.* at 1023.

- Stream had not converted the Hawk Notes and could not do so without raising additional capital: "In 2018, Stream entered into an agreement with Hawk, which provided that the Hawk Notes would convert into equity if and when Stream raised additional equity capital." *Id.* "[N]either the Hawk Notes nor the SLS Notes ever converted into equity, and the notes remain outstanding." *Id.*

Although those findings were made at the injunction stage, the court later granted a motion for partial summary judgment by SeeCubic. *See Stream TV Networks, Inc. v. Seecubic, Inc.*, 2021 WL 4352732, at *2–3 (Del. Ch. Sept. 23, 2021) (ORDER) (the "Summary Judgment Order"). In the Summary Judgment Order, this court incorporated by reference the factual findings from the Injunction Opinion. *See id.* at *1. Based on the Summary Judgment Order, the court entered the First Partial Final Judgment.

The Supreme Court Decision reversed this court's legal determination that the Omnibus Agreement was valid. The decision did not overturn the court's factual findings, which the Delaware Supreme Court largely adopted. Those findings included the following:

- Hawk holds secured debt in Stream: "Stream's junior secured creditor, Hawk Investment Holdings Limited ('Hawk'), loaned Stream more than £50 million, plus $1.336 million, through a series of junior secured notes (the 'Hawk Notes')." Supreme Court Decision, 279 A.3d at 327. Stream had pledged "all of its assets" as security for the more than £50 million in notes that Hawk lent to Stream. *Id.*

32

- Stream had defaulted on its debt: "[B]y the end of February 2020, Stream had defaulted on the SLS Notes and the Hawk Notes." *Id.*

- Hawk has valid and enforceable creditor rights: "Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted." *Id.*

On remand, this court implemented the Supreme Court Decision through the Second Partial Final Judgment. That order has become final. Each of these issues was thus finally adjudicated on the merits.

The other elements for collateral estoppel are satisfied because Stream was a party to the Omnibus Agreement Litigation. Stream initiated the Omnibus Agreement Litigation, and the Delaware Court of Chancery had jurisdiction over the subject matter of that action and the parties before it.

Stream also had a full and fair opportunity to litigate these issues in the Omnibus Agreement Litigation. Principals of preclusion "extend[] to all issues which might have been raised and decided in the first suit as well as to all issues that actually were decided." *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 191–92 (Del. 2009) (internal quotation marks omitted). "Thus, unless there are factors to suggest that a party to a prior action did not have a full and fair opportunity to litigate the issue in the first action or that differing circumstances justify allowing an opportunity to relitigate, that party may be estopped from rearguing an issue of fact already decided." *In re Asbestos Litig. (Lee)*, 517 A.2d 288, 293 (Del. Super. 1986).

Stream had every incentive to raise all available challenges to the validity of the secured debt that supported the Omnibus Agreement. The fact that Hawk and SLS were

secured creditors is what enabled a majority of Stream's directors to engage in a friendly foreclosure. Because Hawk and SLS held those rights, this court found that SLS and Hawk were "levying on their security." Injunction Decision, 250 A.3d at 1041. That fact is what enabled the court to find that without the Omnibus Agreement, Stream and its stockholders would have been left with nothing. It also provided the underpinning for the court's conclusion that Section 271 of the DGCL was never intended to apply to a transaction that transferred collateral to a secured creditor. *Id.* at 1038–39. And it resulted in the court analyzing the enactment of Section 272 of the DGCL, which makes clear that a mortgage or pledge of corporate property and assets to secure debt does not require stockholder approval. *Id.* at 1038. It likewise caused the court to consider a transcript ruling from then-Vice Chancellor Strine, which held in a similar scenario that a transfer of assets to secured creditors did not require a stockholder vote. *Id.* at 1043.

In an effort to avoid the application of collateral estoppel, Stream posits that "[f]or present purposes, Stream challenges none of the Court's parallel former rulings beyond those already reversed." Dkt. 53 at 2. That is slippery language, which Stream has a history of deploying. That formulation accepts the court's rulings for purposes of briefing on Stream's motion to dismiss and Hawk's motion for summary judgment, while keeping open the possibility that Stream might advance different arguments later in the case. The better course is for the court and the parties to know what is open for dispute in this litigation. With the benefit of the ruling on the application of collateral estoppel, the parties know how the trial court will treat these matters.

34

Evidencing its wily ways with words, Stream argues that although it purportedly is not challenging the court's prior finding that "a default event on the Hawk notes occurred in early 2020," Stream nevertheless remains free to litigate its contention that there was an "unlawful conspiracy that artificially manufactured the 2020 default events through bribery and internal sabotage." *Id.* at 2–3. That is another way of contending that a default never really occurred. If Stream wanted to advance that argument, it had to do so in the Omnibus Agreement Litigation. Collateral estoppel bars Stream from advancing that argument now.

Stream tries a similar gambit regarding its ability to convert the Hawk Notes into equity. While claiming that it is not challenging the court's prior finding that "Stream had not converted Hawk's debt into equity at the time of the default event," Stream simultaneously argues that it can litigate "the scope and effect of Stream's debt-to-equity conversion agreements with Hawk." *Id.* at 3. That too represents an effort to relitigate an issue that this court already decided. To resolve the Omnibus Agreement Litigation, the court had to address whether a debt-to-equity conversion had occurred, and resolving that issue required a ruling on whether a triggering event for exercising the conversion right had occurred. The court ruled on both topics. Stream cannot relitigate those rulings.

On this latter issue, however, a cautionary note is warranted. This court entered the First Partial Final Judgment in the Omnibus Agreement on November 10, 2021, and the court's factual finding as to the absence of any conversion was effective as of that date. The record before this court constituted the record on appeal, and the Second Partial Final Judgment was entered on the same record. Collateral estoppel does not bar Stream from

35

litigating about events that may have happened after November 10, 2021. Stream cannot dispute the court's now-final ruling that Stream must raise new equity financing before gaining the right to convert the Hawk Notes into equity, but Stream may seek to prove that it did so after the entry of the First Partial Final Judgment.

## V. CONCLUSION

Stream's motion to dismiss is denied. Hawk's motion for partial summary judgment is granted. The parties will confer on a schedule for bringing these proceedings to a conclusion at the trial level.